**Arthur Ray AVERY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 61039.**

Court of Criminal Appeals of Texas,
Panel No. 1.

May 19, 1982.

Michael H. Rodgers, Dallas, for appellant.

Henry Wade, Dist. Atty. & J. T. Langford, Stewart Robinson & Reed Prospere, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, CLINTON and McCORMICK, JJ.

## OPINION

CLINTON, Judge.

In this appeal from a judgment of conviction for aggravated robbery the controlling question is whether "*any* rational trier of fact"[1] could have found the only disputed element of the offense—identity of the appellant as its perpetrator—beyond a reasonable doubt, given the unusual circumstances surrounding the initial identification of appellant by the victim of the robbery, but viewing them in the light most favorable to the prosecution.[2] We conclude that such a trier of fact could have and, other grounds of error being without merit, will affirm the judgment.

During the early morning hours of Thursday, December 16, 1976, James Provard was working as a night manager of a convenience store alone in the southwest part of Dallas. The only customer came to the checkout counter with a quart of milk and a loaf of bread, and asked Provard for a pack of cigarettes. After Provard turned his back, got a pack and again faced the customer, he saw the customer had produced a revolver and, with its butt resting on the counter, was pointing it at him. Then followed the all too common-place transaction of a "stickup," during the course of which there was, however, one departure from the norm: the robber commanded Provard to take four money order forms and machine-issue each for one hundred dollars. Having done that, Provard was placing them in the

sack with the milk and bread when he was told to put a cigar box containing all records of money orders in the sack as well. The robber made him open the cash drawer and remove some one hundred dollars in currency, adding it to the sack.

All this occurred over a brief period of time under bright overhead lights, and from time to time Provard was more or less face-to-face with the robber, who was without disguise of any sort. But when the loot had been sacked up, and no more was demanded, Provard, feeling it was, in his words, "the moment of truth," looked into his eyes.[3]

Provard, as a reflexive action, turned to dive under the counter. The first bullet hit just behind his left ear, driving his body to the floor, where he landed on his elbows. The second shot went through his left arm. Provard "played dead," and got up only after he was satisfied the robber had left. The ordeal continued as he tried to call for help, using the only phone available—an outside pay phone.

Still at the scene Provard told officers what had happened and described his assailant. Later during his stay in a hospital he was interviewed by police officers, and on more than one occasion he was shown photographs of possible suspects, but was unable to make any identification. The investigation at the scene produced only a latent palm print from the counter determined to be made by someone other than appellant. Elsewhere, it produced nothing, literally, according to the three other witnesses for the prosecution.[4]

---

1. Emphasis by the Supreme Court; all other emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

2. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Griffin v. State*, 614 S.W.2d 155 (Tex.Cr.App.1981).

3. Recalling it, Provard testified without objection:

   "After I—we looked in the cash drawer and got the green money. I looked into his eyes. I knew that something was going to happen to me—I would be ordered to the back of the store or to lie down, something of this sort, but—to me—I had been extremely

nervous during these transactions. This was, I felt, the moment of truth where my disposition would be determined. I looked him in the eye. He was looking me straight in the eye. Then the gun came up for the first time."

4. For examples, none of the four money orders was ever presented for payment; the other records were never discovered; a spent slug or the gun was not found; no other witness to any event surrounding the robbery was located. Except that Provard had been shot and bled on the floor near the counter, the police investigation failed to turn up any evidence of the offense.

Seriously injured, Provard was hospitalized for some two weeks, and incapacitated from work until March 1977. Omitting many of the details, suffice to say that the resulting financial difficulty created marital stresses that led to a divorce situation and an order that Provard make certain payments for child support. Unable to stay current with those required payments, Provard was held in contempt and confined in a minimum security facility of the Dallas County Jail on August 1, 1977. He was to remain there for two and one half months.

On September 1, 1977, about 260 days after the robbery, walking in the hall of the Woodlawn facility, Provard noticed another prisoner coming from the opposite direction. "I looked straight into his face and it was an immediate, spontaneous recognition on my part right then and there. I felt that—there was a tremor of recognition in response somehow," Provard testified. Just after they passed each other, Provard looked back around "to see what his reaction was," and "he turned around and glanced back and we both turned our heads forward again." Provard again saw the same man later that evening in the television-recreation room, and there was not any doubt that was the man who robbed him.

Perplexed about how to handle the situation, Provard waited until the next day when a jailer would have time to talk; he related to him what had occurred. Believing the man was on a work release program, in the afternoon he was shown photographs of some work releasees, but did not make an identification. Still later, when inmates on work release were returning to the facility Provard observed them as they came in. As they passed by he caught the profile of a man wearing a cap, and "I felt that was him, but I was not sure." About ten minutes later though, as the same man was going into the recreation room without

a cap on, Provard "saw him front-on facewise again and that was him." At this point in his direct examination, told to do so, Provard left the witness stand, approached the seated appellant, looked right in his face and, resuming his place on the stand, testified there was then not "any doubt whatsoever this man, Arthur Ray Avery, is the man that robbed [me], shot [me] and left [me] for dead" in that convenience store.

On crossexamination Provard was taken over the germane events again, confronted with the fact that at an examining trial he said the robbery had occurred a day earlier; redirect examination did not present anything new. On recross examination the entire colloquy was:

"Q: Mr. Provard, is there any chance you're wrong about this identification?

A: No.

Q: There's no way in the world you are wrong about this?

A: It's a pretty serious matter.

Q: I understand that. There's no way you can be wrong about it?

A: No." [5]

Appellant was the first defense witness. He denied all guilt and presented an alibi, in which he was joined by members of his family. Regularity of employment was demonstrated through testimony of his employer and work records. It was developed, that although "arrested" just after Provard had identified him in the Woodlawn facility, for some undisclosed reason the grand jury nobilled him and appellant was released—only to be again arrested as he walked along near his mother's house May 22, 1978. His own place of residence was never searched, nor was he interrogated. Appellant, twenty five years old at time of trial, conceded two prior felony convictions alleged for enhancement.[6]

5. Passed back to the State, Provard reiterated his certainty in much the same words.

6. One was a March 1975 conviction for rape of a child with punishment of confinement for two years; the other was a February 1972 two year sentence for theft of personal property. Appel-

lant admitted he had been a thief, but stoutly denied being a robber. The trial court carefully instructed the jury that evidence of prior convictions was to be considered by it for no other purpose than "in passing on the credibility of the defendant as a witness in this case and to

The jury found him guilty and that the enhancement allegations were true. The trial court, accordingly, assessed punishment at confinement for life.

Pointing out that the credibility of Provard is not challenged, appellant asserts that the issue is his ability to recall facts and identify the robbery, and urges the Court to "rule *as a matter of law* that the facts in this particular case are such that no reasonable jury could find the evidence of guilt conclusive beyond a reasonable doubt [emphasis by appellant]." For its part, the State argues that the testimony of Provard is itself sufficient, with emphasis on the fact that he "never failed to identify" appellant as the robber, and citing *Hunnicutt v. State*, 523 S.W.2d 244, 247–248 (Tex.Cr. App.1975) and *Northcutt v. State*, 478 S.W.2d 935 (Tex.Cr.App.1972). The problem with both cases, however, is that in each there was more than identification evidence linking the accused to the offense charged; here we have only Provard's say so.

> "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. [footnote omitted] Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is preverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' The Case of Sacco and Vanzetti 30 (1927). A major factor contributing to the high incident of miscarriage of justice from mistaken identification has been *the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identifica-*

*tion.* \* \* \* And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his *susceptibility to suggestion* the greatest."

*United States v. Wade*, 388 U.S. 218, 228–229, 87 S.Ct. 1926, 1932–1933, 18 L.Ed.2d 1149 (1967).

While acknowledging wellknown "vagaries of eyewitness identification," we hasten to remark that in the record before us there is not *any* "degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification" and, thus, no "susceptibility to suggestion." Psychologically, perhaps, Provard may have been so driven by torment and tribulation of his own personal experiences to be watchful for his assailant and, indeed, hopeful of finding him, that when he encountered appellant in the Woodlawn corridor he believed appellant to be the robber because he wanted to.[7] However, in our criminal justice system jurors— "the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony"—are trusted to sort out just such indicia of fallability in identification.

As the Supreme Court of the United States pointed out in *Watkins v. Sowders*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981):

> ". . . [T]he proper evaluation of evidence under instructions of the trial judge is the very task our system must assume juries can perform. Indeed, . . . the *only* duty of a jury in cases in which identification evidence has been admitted will often be to assess the reliability of that evidence [emphasis by the Supreme Court]." *Id.*, at 347, 101 S.Ct. at 658.

It noted also the Opinion of the Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct.

aid . . . in deciding upon the weight you will give to him as such."

7. Surely, appellant's attorney had much the same notion in mind when he argued to the jury that Provard "gets put in jail all as a result of this robbery," he had "a reason to feel very

bitter," to feel "awful" and to feel "hate," being in jail, as he was, "with a bunch of people that he knew were guilty of crimes and he wasn't guilty of any crime." In that context, he added, "I believe that Mr. Provard believes Mr. Avery is the robber."

**614**

2243, 53 L.Ed.2d 140 (1977) had quoted with approval a statement in *Clemons v. United States,* 133 U.S.App.D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (Concurring Opinion of Judge Leventhal), *viz*:

> "Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification— including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi."

Here, in that same environment and considering all the facts and circumstances, the jury assessed the reliability of identification testimony from Provard against countervailing defensive testimony of alibi. Viewing the evidence in the light most favorable to the prosecution, we conclude that collectively, as a rational trier of fact, any jury could have found the only disputed element of the offense—identity of appellant as the offender—beyond a reasonable doubt. The first ground of error must be overruled.

The next three grounds of error challenge propriety of the prosecuting attorneys in making certain remarks and framing particular questions during cross-examination of appellant, and in making a comment during argument he sees as implying existence of evidence of guilt not before the jury. As to grounds two and three, appellant concedes he did not object or the objection made was too general, but contends that the performance was so calculated to inflame the minds of the jury and is of such prejudicial character that an instruction to disregard would not have cured it, so he cannot be faulted for not protecting the record. On the authority of *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App. 1976), a capital case that is illustrative of others, we overrule grounds two and three. As to ground four, the objection voiced was: "He's alluding to matters outside the record;" the trial court responded, "Stay in the record, please." No other relief was requested, so nothing is presented for review.

Finally, ground of error five contends one of the convictions used to enhance punishment is based on an indictment that is fundamentally defective. When the penpacket reflecting this conviction was offered, appellant's only objection was "the one contained in my motion," meaning we assume a motion to dismiss enhancement count filed pretrial and denied by the court on the second day of trial. The claim stated in the motion was constitutionally based on the theory that V.T.C.A. Penal Code, § 21.09 violates the Equal Protection Clause; the claim briefed, however, is that the indictment is fundamentally defective in the allegations which are set out. The State defends its validity. No one tells us where we may find the indictment in the record, and we have not discovered it. Again, nothing is presented for review.

The judgment of conviction is affirmed.