

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-76,049

**HUMBERTO LEAL, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S APPEAL FROM THE DENIAL OF A MOTION FOR POST-CONVICTION DNA TESTING FROM THE 186th JUDICIAL DISTRICT COURT OF BEXAR COUNTY

JOHNSON, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, PRICE, KEASLER, and HOLCOMB, JJ., joined. WOMACK, J., dissented. HERVEY and COCHRAN, JJ., did not participate.

### O P I N I O N

Appellant appeals from a trial-court order denying his motion for post-conviction DNA testing. Appellant was convicted of capital murder and sentenced to death. On direct appeal, we affirmed his conviction and sentence. *Leal v. State*, No. 72,210 (Tex. Crim. App., delivered February 4, 1998)(not designated for publication), *cert. denied*, 525 U.S. 1148 (1999). In 2008, appellant filed a motion for DNA testing of evidence pursuant to Chapter 64 of the Code of Criminal Procedure. Without conducting a hearing, the trial court denied that motion. Appellant appeals the trial court's denial.

**I. Facts**

Appellant was convicted of killing a teen-aged girl. The indictment alleged that he had committed capital murder by intentionally causing the death of the complainant in the course of committing and attempting to commit kidnapping or aggravated sexual assault. The jury found appellant "guilty of capital murder as charged in the indictment" and answered the special issues in such a manner that the trial court assessed a sentence of death.

Appellant filed a motion pursuant to Chapter 64 that sought the release of biological material that had been used as evidence at his capital-murder trial so that it could be subjected to DNA testing. The motion requested the release of blood and biological material obtained from appellant's underpants and introduced as evidence at his trial, the underpants themselves so that testing could be performed on any biological material remaining on them, various swabs and smears obtained from the victim, and other biological material obtained from the victim's body at the crime scene.

We quote from our opinion on direct appeal which includes details of the evidence presented at trial.

> The evidence presented at trial shows that on May 20, 1994, the intoxicated sixteen-year-old victim was at a party. The twenty-three-year-old appellant also was at the party. At some point the intoxicated but conscious victim was placed in appellant's car. Appellant and the victim left together in appellant's car.
> About thirty minutes later, appellant's brother arrived at the party in a car which came to a screeching halt. Appellant's brother was very excited or hysterical. Appellant's brother started yelling to the people left at the party, "What the hell happened!" Appellant's brother was yelling that appellant came home with blood on him saying he had killed a girl. Witnesses Torres and Ortega were present when appellant's brother made these statements. Shortly thereafter appellant's brother left in a rush.
> Several of the party members went looking for the victim in the same area where the party was. They found her nude body lying face-up on a dirt road. They noticed the victim's head had been bashed in and it was bleeding. Her head was flinching or jerking. These party members called the police.

When the police arrived, they saw the nude victim lying on her back. There was a 30 to 40 pound asphalt rock roughly twice the size of the victim's skull lying partially on the victim's left arm. Blood was underneath this rock. A smaller rock with blood on it was located near the victim's right thigh. There was a gaping hole from the corner of the victim's right eye extending to the center of her head from which blood was oozing. The victim's head was splattered with blood.

There was a bloody and broken stick approximately 14 to 16 inches long with a screw at the end of it protruding from the victim's vagina. Another 4 to 5 inch piece of the stick was lying to the left side of the victim's skull. The police made a videotape of the crime scene[,] portions of which were admitted into evidence.

Later that day, the police questioned appellant. Appellant gave two voluntary statements. In appellant's first statement he said he was with the victim in his car when she began hitting him and the steering wheel causing him to hit a curb. Appellant attempted to calm her down but the victim leaped from appellant's car and ran away. Appellant claimed he sat in his car and waited about ten or fifteen minutes to see if the victim would return and when she did not he went home.

After giving this statement, appellant was informed that his brother had also given a statement. Appellant then gave another statement. In this statement, appellant claimed he followed the victim when she got out of his car and ran away. Appellant claimed the victim attacked him. Appellant pushed her and she fell to the ground. When she did not get up appellant attempted to wake her but could not. He then looked at her nose and saw bubbles. Appellant stated he got scared, went home, prayed on the side of his mom's bed and told family members what had happened, claiming it was just an accident. After giving this statement an officer gave appellant a ride home.

*Leal v. State*, *supra*, slip op. at 1-3. The record at trial reflected that multiple male attendees of the party sexually assaulted the intoxicated sixteen-year-old complainant[1] before she left with appellant in his car. Appellant asserts that he sought DNA testing of the biological evidence because such testing would prove his innocence of the indictment's aggravating factor of committing and attempting to commit the aggravated sexual assault of the complainant. In support of his motion, appellant attached an affidavit from Dr. Elizabeth A. Johnson.

---

[1] Toxicology results from the autopsy showed that the complainant's blood-alcohol level was .255. Her blood tested positive for cocaine, cocaine metabolites, and marijuana metabolites.

## II. Analysis

We have held that, under TEX. CODE CRIM. PROC. art. 64.01(b), a convicted person may request the convicting court to permit DNA testing of evidence containing biological material that was in the state's possession during trial if that evidence: 1) was not previously subjected to DNA testing because DNA testing was not available; 2) was not previously subjected to DNA testing because DNA testing was available, but not technologically capable of providing probative results; 3) was not previously subjected to DNA testing, through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing; or 4) was previously subjected to DNA testing, but can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test. *Routier v. State*, 273 S.W.3d 241, 245-46 (Tex. Crim. App. 2008). If one or more of the items that an appellant wishes to subject to post-conviction DNA testing meet any of these criteria, the trial court may order such testing–but only if the appellant also satisfies other statutory requirements, including a showing, by a preponderance of the evidence, that he would not have been convicted if exculpatory results had been obtained from DNA testing. *Id*. at 246, *citing* TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A).

When this Court reviews a trial court's ruling, we ordinarily give almost total deference to the trial court's resolution of questions of historical fact and issues of the application of law to fact that turn on witness credibility and demeanor, but we consider all other questions of the application of law to fact *de novo*. *Id*., *citing Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

"Under Article 64.03, a defendant is not entitled to DNA testing unless he first shows that unaltered evidence is available for testing; that identity was an issue in the case; that there is greater

than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results; and that the request is not to delay the execution of the sentence." *Prible v. State*, 245 S.W.3d 466, 467-68 (Tex. Crim. App. 2008), *cert. denied*, 129 S.Ct. 54 (2008). "The identity requirement in Chapter 64 relates to the issue of identity as it pertains to the DNA evidence. Therefore, if DNA testing would not determine the identity of the person who committed the offense or would not exculpate the accused, then the requirement of Art. 64.03(a)(2)(A) has not been met." *Id*. at 470.

Appellant states that the issue presented in his current appeal is whether he has established under Chapter 64 that he is entitled to have forensic testing performed on biological material introduced as evidence in his capital-murder trial. He notes that this case presents a question of first impression: "Whether a petitioner is entitled to forensic testing under Chapter 64 if the evidence sought would exculpate him solely of capital murder, rather than the homicide itself." (Appellant's Amended Brief, p. 2) Appellant acknowledges that he confessed that he may have accidentally killed the victim, that he was the last person seen with her before her body was discovered, and that the state "had little difficulty proving that he was responsible for her death." Nevertheless, appellant contends that there was little evidence to support the state's allegation, based on the state's theory that appellant had kidnapped and sexually assaulted the complainant, that he had committed capital murder. (Appellant's Amended Brief, p. 3)

Many offenses include lesser offenses that differ from the greater offense by a single element. Disproving that single element disproves the greater offense. *See, e.g., Whipple v. State*, 281 S.W.3d 482, 502 (Tex.App.–El Paso 2008)(accused is guilty of only a lesser-included offense if there is evidence that affirmatively rebuts or negates an element of the greater offense). For example,

aggravated assault based on the use of a deadly weapon may become assault if the alleged use of a deadly weapon is disproved. The aggravating factors that raise murder to capital murder are likewise elements of the greater offense. Thus, an appellant may be entitled to forensic testing under Chapter 64 if the evidence sought would exculpate him only of the alleged aggravating-factor elements of capital murder, rather than the murder itself.[2] However, new DNA testing of such evidence must exculpate him of *all* of the statutory aggravating factors that were alleged in the indictment to elevate murder to capital murder. The convicting trial court "shall order that the requested forensic DNA testing be conducted" only if it finds that untainted, testable biological evidence exists, that the identity of the perpetrator was an issue (Art. 64.03(a)(1)), and that the convicted person meets the requirements of Art. 64.03(a)(2). TEX. CODE CRIM. PROC. art. 64.03(c).

Any or all of the alternate manner and means of committing capital murder contained within TEX. PENAL CODE § 19.03 may be submitted to the jury disjunctively without violating the right to jury unanimity, whether the alternate theories are found in the same or different sections, so long as the same complainant is alleged for the predicate murder, as is the case here. *Gamboa v. State*, ___ S.W.3d ___, ___, No. AP-75,635 (Tex. Crim. App., delivered April 8, 2009), 2009 Tex. Crim. App. LEXIS 512, *21. *See also Luna v. State*, 268 S.W.3d 594, 600-01 (Tex. Crim. App. 2008)(a jury's return of a general verdict of "guilty of capital murder as charged in the indictment" does not violate the unanimity requirement when capital murder had been charged in separate paragraphs that each allege an alternative manner or means of committing capital murder). *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004)(if an indictment alleges different manner or means of committing

---

[2] "If the jury or, when authorized by law, the judge does not find beyond a reasonable doubt that the defendant is guilty of an offense under this section, he may be convicted of murder or of any other lesser included offense." TEX. PENAL CODE § 19.03(c).

capital murder in the conjunctive, the jury may properly be charged in the disjunctive, and the unanimity requirement is not violated by instructing the jury on alternative theories of committing the same offense). Thus in this case, the jury's general verdict in response to instructions based upon alternative aggravating factors of capital murder–kidnapping and sexual assault–did not violate the unanimity requirement.

Art. 64.03(a)(2)(A), requires the convicted person to establish by a preponderance of the evidence that "the person would not have been convicted if exculpatory results had been obtained through DNA testing . . .." We have interpreted this phrase to mean a "greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results . . .." *Prible v. State*, 245 S.W.3d at 467-68. Because the jury found appellant "guilty of capital murder as charged in the indictment," which included both kidnapping and aggravated-sexual-assault paragraphs, he must show that there is greater than a 50% chance that he would not have been convicted under either paragraph if the DNA testing provides exculpatory results.

**Identity**

Art. 64.03(a)(1)(B), requires that identity was an issue in the case. The identity of the accused as the perpetrator of the aggravating factors is an essential element of capital murder. *Avery v. State*, 632 S.W.2d 610, 614 (Tex. Crim. App. 1982); *Ellison v. State*, 154 Tex. Crim. 406, 410, 227 S.W.2d 545, 548 (Tex. Crim. App. 1950). "[T]he state must always establish the identity of the accused as an element of its case-in-chief." *Jaubert v. State*, 74 S.W.3d 1, 12 (Tex. Crim. App. 2002), *quoting Wilson v. State*, 581 S.W.2d 661, 668 (Tex. Crim. App. 1979). While conceding his guilt of the complainant's murder, appellant strongly denies committing either sexual assault or kidnapping and asserts that DNA testing will exonerate him. Thus the identity of the perpetrator of

the predicate aggravating factors of the alleged capital murder is at issue, and appellant satisfies Art. 64.03(a)(1)(B).

### The Sexual-assault Allegation

Appellant's motion focused upon the prospect that the results of the requested DNA testing would undermine evidence of the sexual-assault allegation. He argues that, since no blood consistent with that of the complainant was found on his outer clothing, it was very damaging to his defense that evidence indicated that the complainant was a possible donor of blood discovered on his underpants. Appellant asserted in his motion that this blood evidence undermined his claim that he never attempted to have sexual contact with the complainant, and he noted that the prosecution strenuously argued the incriminating nature of that evidence.[3] Appellant contended that more modern DNA testing would produce a more accurate analysis of the blood found on his underpants, "quite possibly excluding the victim as a donor and thereby undercutting the very basis for the jury's capital verdict." (Appellant's Motion for DNA Testing, p. 5.)

The motion also points to Dr. Johnson's affidavit, which calls into question the protocol used in the testing procedures and suggests that some of the testimony about those procedures was misleading. Dr. Johnson also recommended that the biological samples from the underpants be tested using the newer DNA testing techniques that provide superior discrimination among samples than did the older systems. Appellant's motion asserted that, without the DNA expert's testimony at trial, there was no reliable evidence that he sexually assaulted the complainant. The motion maintained that "testing the pubic hair and rectal smears will provide further evidence that

---

[3] The prosecutor argued that the only reason for appellant to have blood on his underpants, but not on his outer clothing, was that he had removed his outer clothing before sexually assaulting the complainant.

[appellant] was not the person who sexually assaulted [the complainant] before her death." (Appellant's Motion for DNA Testing, p. 16.)

Of the articles submitted for testing before trial, a pair of blue jeans, a second pair of blue jeans, a red T-shirt, appellant's socks, boots, and car floor-mats, and the oral and vaginal swabs from the complainant had no blood or semen stains. The complainant's fingernail had no blood, semen, or foreign tissue. The pubic hair found on the complainant was consistent with her hair; no foreign pubic hairs were found. The pubic hair taken from appellant's body while he was in custody is known to be appellant's hair. DNA testing would do nothing more than confirm what is already known. The same is true of blood that was drawn from appellant at the Bexar County jail and blood drawn from Elvira Briones, appellant's girlfriend, at the Bexar County Forensic Sciences Center.

Blood was detected on the complainant's brown pullover and cuttings from the pullover, appellant's T-shirt, appellant's underpants and cuttings from the underpants, the piece of asphalt that was presumed to be the murder weapon, and the stick from the complainant's body, which had blood on it, but no finger prints. Semen was detected on appellant's underpants and its cuttings and on the rectal swabs and smears from the complainant.

Considering the results of the original testing done at the Bexar County Forensic Sciences Center, we conclude that only the following articles contained blood or semen and thus have potential to be relevant to the issue of appellant's guilt of sexual assault: the complainant's pullover, the piece of asphalt, appellant's T-shirt and underpants, the piece of stick from the body of the complainant, and the vaginal, oral, and rectal swabs and smears.

Testimony at trial established that the complainant was sexually assaulted by multiple males while she was at the party that she attended just before her death. Mixtures present problems in

DNA testing. While each individual has a distinctive pattern, other individuals' pattern may overlap that pattern. If individual A shows peaks at 10, 12, and 31 and individual B has peaks at 14, 17, and 23, it will be impossible to tell whether an individual who has peaks at 10, 17, and 31 was a contributor or was excluded as a contributor. It is apparently for this reason that, after testing established the presence of sperm in the rectal samples, no further testing appears to have been done.

Some of the relevant evidence was sent to the forensic laboratory of the Department of Public Safety (DPS) in Austin for tests that the Bexar County laboratory did not have the equipment to do. The testing in Austin focused on the complainant's pullover, and appellant's T-shirt and underpants. The DPS serologist performed a DQ Alpha test. Using known samples of blood from the complainant, appellant, and Elvira Briones, she determined that the complainant and Briones had DQ Alpha profiles of 1.1, 4, while appellant's profile was 4. The blood on appellant's T-shirt had a profile of 4 and was thus consistent with appellant and excluded the complainant and Briones. This piece of evidence can neither exculpate nor inculpate appellant.

The blood on the complainant's pullover had a profile of 1.1, 4 and was consistent with appellant and both the complainant and Briones. The blood and semen on appellant's underpants had a profile of 1.1, 4 and was also consistent with the blood profiles of the complainant, appellant, and Briones. Because the DPS lab was not equipped to run more definitive testing, the samples were sent to Roche Biomedical Laboratory[4] in Virginia.

Seven additional DNA tests were run at Roche. These tests established that the blood on the pullover was consistent with the complainant and excluded Briones and appellant as contributors. The male fraction of the semen stain was consistent with appellant. The female fraction in the semen

---

[4] By the time of trial, Roche Biomedical Laboratory had become Laboratory Corporation of America.

stain was consistent with Elvira Briones and excluded the complainant. Some samples were consistent with the blood having been deposited after and over the semen stain.

The Roche serologist, Megan Clement, testified about the testing procedures used on the blood stains from appellant's underpants, the possible profiles produced by each test, and the results from each test. The aim of such testing is to exclude individuals as donors. If the first test does not exclude an individual, another test is performed, and so on, until the individual is excluded. If, after all of the tests are performed, an individual cannot be excluded, the person will be said to have DNA consistent with the tested material. Clement testified that, with the science available at the time of trial in 1994, no one could credibly say that an unknown blood sample came from a given individual, but a probability could be calculated.

LDLR has three possible profiles: A, B, and AB. Appellant was an A, while the complainant and Briones were B. The test showed a mixture of A and B. No one was excluded as a donor, so Clement went on with testing.

GYPA has three possible profiles: A, B, and AB. Appellant and Briones were A, while the complainant was B. The test showed A and B. This is consistent with the complainant contributing to the blood on appellant's underpants.

HBGG has six possible profiles: A, B, C, AB, AC, and ABC. Appellant and Briones were AB, while the complainant was A. The test showed AB. No one was excluded.

D7S8 has three possible profiles: A, B, and AB. Appellant and Briones were AB, while the complainant was A. The test showed AB. No one was excluded.

GC has six possible profiles: A, B, C, AB, AC, and ABC. The complainant and appellant are AB, while Briones is AC. The test showed AB, with a weak C. No one was excluded.

D1S80 has twenty-one possible options. Combined with possible pairings of those options, there are 372 possibilities. Everyone receives half of their genetic material from the mother and half from the father. This test examines a small area of a chromosome and looks for the band from the mother and the band from the father. The complainant had a single band at 24, indicating that both parents passed on the same marker. Such a single band is stated as 24, 24. Appellant showed bands at 28 and 31. Briones showed bands at 17 and 24. Two semen samples from appellant's underpants showed bands at 17, 24, 28, and 31, with 24 being the strongest band. This mixture is consistent with contributions from all three presumptive donors. One sample showed bands at 24, 28, and 31. This sample excludes Briones as a donor, but is consistent with contributions from appellant and the complainant. The fourth sample showed a single band at 24. This is consistent with the complainant and excludes appellant and Briones.

HUMTH01 showed a mixture of 6, 7, 8, 9, and 10. The complainant contributed 7 and 9. Appellant contributed 6 and 10. Briones contributed 7 and 8. Subtracting the 6, 7, 8, and 10 contributed by appellant and Briones, we are left with 9, which is consistent with a contribution from the complainant. The 9 was seen in all four semen samples.

Chapter 64 provides that DNA may be granted if the evidence was not tested or, if previously tested, "can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." TEX. CODE CRIM. PROC. art. 64.01(b). LDLR, HBGG, D7S8, and GC did not exclude anyone. GYPA revealed a profile that, of the three individuals thought to have been possible donors, only the complainant could have contributed the B profile. The strong 24 band in two tests using D1S80 indicate a 24 contributor in addition to Briones, and the complainant was a 24, 24. One D1S80 sample was a

mixture that was consistent with contributions from appellant and the complainant, but excluded Briones. The fourth sample excluded appellant and Briones, but was consistent with the complainant. HUMTH01 revealed a mixture that was consistent with contributions from all three donors. In sum, four tests did not exclude any of the three presumptive donors. One test on an unknown number of samples and two tests on six of eight samples were consistent with the presence of the complainant's blood.

Appellant submitted the affidavit of Dr. Elizabeth Johnson in support of his motion for DNA testing. She criticizes the protocols and handling of the 1994 samples and surmises that the samples were contaminated because of mishandling. She recommended retesting with the Short Tandem Repeat (STR) DNA protocol, which is more discriminating than the tests available in 1994. However, even if STR testing excluded the complainant as a contributor, it cannot be said that such a result "establishes by a preponderance of the evidence that the person would not have been convicted . . . ." TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A). Other evidence pointed to murder in the course of sexual assault: appellant is the last person known to have seen the complainant alive, and he concedes that he killed her; when she was placed in appellant's car, she was fully clothed; when her body was discovered, it was nude and a stick protruded from its vagina; sexual assault may be committed by penetration with any object; the complainant's pullover was found at the home of appellant's parents.

Given the extensive original testing done, the results produced, and other evidence of sexual assault, we cannot say that further testing would establish by a preponderance of the evidence that appellant would not have been convicted.

**The Kidnapping Allegation**

Even assuming *arguendo* that STR DNA testing has the potential to exonerate appellant of sexual assault, appellant must also demonstrate that the testing would exonerate him of the alternative aggravating factor of kidnapping before he can claim that there is a greater than 50% chance that he would not have been convicted if DNA testing had provided exculpatory results.

Appellant's Amended Brief asserts that he has "consistently and repeatedly denied that he kidnapped or sexually assaulted" the complainant and reiterates that the "evidence supporting the kidnapping charge was virtually nonexistent." (Appellant's Amended Brief, p. 3) Appellant also argues that the "need for forensic testing is reinforced by the state's reliance on weak circumstantial evidence and junk science to support a capital murder conviction." (Appellant's Amended Brief, p. 8.) He maintains that the facts surrounding the two aggravating factors were inseparable such that, if the jury found reasonable doubt as to the sexual assault, then it "would have found reasonable doubt as to the kidnapping–particularly in light of the insubstantial evidence supporting the kidnapping element." (Appellant's Post-submission Letter Brief, p. 3.)

Appellant's amended brief argues that the jury could not have convicted him of kidnapping on the basis of the evidence of kidnapping that was introduced at trial. He notes that the state relied on two pieces of evidence to suggest that a kidnapping occurred: 1) Luminol testing, which the state argued revealed the presence of the complainant's blood in appellant's car; and 2) the complainant's body was found in a place that was not on the way to her house, thus indicating that she was taken there against her will.

Appellant disparages the Luminol testing as "merely a presumptive test for blood" that cannot differentiate between animal blood and human blood and also reacts to substances that are not

blood.[5] (Appellant's Amended Brief, p. 11.) He suggests that such testing is unreliable and can be misleading to a jury; such results are often excluded by courts unless additional confirmatory tests have been done. He notes that, in this case, no such confirmatory tests were done.

Appellant points out that the complainant was seen willingly entering his car while highly intoxicated, and that a witness indicated that the complainant was unable to relate information that would help to find her residence. The state argued that the presence of blood in appellant's car suggested that the complainant had struggled to get away while inside the car, which, in turn, suggested that she was taken against her will. Appellant notes that no foreign tissue was found underneath the complainant's fingernails and argues that such lack undermines the state's theory that the two struggled inside the car. (Appellant's Amended Brief, p. 13.)

The evidence that appellant's motion seeks to have tested is not relevant to the kidnapping allegation in the indictment, and results from STR DNA testing of that evidence would have no effect on a finding of appellant's guilt under the kidnapping paragraph's allegation. Although appellant's letter brief argues that the facts surrounding the two aggravating elements are inseparable, they are in fact separate and distinct allegations in his indictment for capital murder. The jury found guilt "as charged in the indictment." Appellant attacks the purported weakness of the evidence supporting the kidnapping allegation, but fails to show how the requested DNA testing would

---

[5] Luminol is used at crime scenes because it reacts with sources of iron, such as blood.

In addition to iron and iron compounds, other substances can catalyze the luminol reaction. Copper and its compounds, horseradish, and bleach also cause the solution to glow. . . . Similarly, the presence of these chemicals at a crime scene affects testing for blood. If a crime scene was washed in bleach, for example, the whole area would glow when sprayed with luminol, making it necessary to use a different test to find traces of blood.

http://www.chm.bris.ac.uk/webprojects2002/fleming/mechanism.htm

provide results that would be exculpatory as to that allegation.

### III. Conclusion

Because the jury found appellant "guilty of capital murder as charged in the indictment," which included both kidnapping and aggravated-sexual-assault paragraphs, appellant must show that there is greater than a 50% chance that, if the DNA testing provided exculpatory results, he would not have been convicted under either paragraph. Appellant has not shown that further DNA testing would establish by a preponderance of the evidence that appellant would not have been convicted based on the allegation of sexual assault. Nor would exculpatory results from new DNA testing have any effect on the evidence of the kidnapping allegation. Thus appellant has not shown that there is greater than a 50% chance that he would not have been convicted of capital murder based upon such testing.

We find that the trial court did not err in denying appellant's motion for DNA testing under Chapter 64, and we affirm the ruling of the trial court.

Delivered: November 18, 2009
Publish