**Humberto Leal GARCIA, Jr., Plaintiff,**

v.

**Aurora SANCHEZ, Timothy Fallon, Henry R. Hollyday, Bexar County Criminal Investigation Laboratory, and Bexar County, Texas, Defendants.**

Civil No. SA–09–CA–950–OG.

United States District Court,
W.D. Texas,
San Antonio Division.

June 20, 2011.

Maurie Levin, University of Texas School of Law, Austin, TX, Sandra L. Babcock, Northwestern University School of Law, Chicago, IL, for Plaintiff.

*MEMORANDUM OPINION AND ORDER DENYING TEMPORARY RESTRAINING ORDER AND DISMISSING AMENDED COMPLAINT*

ORLANDO L. GARCIA, District Judge.

Plaintiff Humberto Leal Garcia has filed an amended complaint and motion for temporary restraining order pursuant to Title 42 U.S.C. Section 1983 and the Supreme Court's recent holding in *Skinner v. Switzer*, — U.S. —, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011), seeking an order from this Court directing officials with the Bexar County Crime Lab to turn over to plaintiff's representatives certain items of clothing and vaginal swabs introduced into evidence during petitioner's July, 1995 capital murder trial for additional DNA testing. For the reasons set forth at length hereinafter, principally because the presence of additional DNA from third parties on any of the material in question would not be probative or material on the issue of

plaintiff's guilt or innocence, plaintiff is not entitled to any relief from this Court pursuant to Section 1983.

**I. *Section 1983 is the Proper Vehicle for Obtaining Post–Judgment DNA Testing***

In *Skinner v. Switzer*, the Supreme Court held an action filed pursuant to Title 42 U.S.C. Section 1983 is an appropriate means for obtaining post-judgment DNA testing in a criminal case. *Skinner v. Switzer*, — U.S. at —, 131 S.Ct. at 1298. Thus, Leal Garcia has chosen an appropriate means to obtain testing of the DNA found in vaginal swabs, clothing, and other items introduced into evidence during his 1995 capital murder trial.

**II. *Procedural History***

The problem facing Leal Garcia is not the type of legal action he has chosen to pursue; rather, it is the simple fact that, under the facts and circumstances of his offense, there is not even a remote possibility additional DNA testing of the items in question will produce any evidence probative or material on the issue of plaintiff's guilt or innocence of the charge of capital murder.

Pursuant to Rule 201, Fed.R.Evid, this Court hereby takes judicial notice of the contents of all the pleadings, motions, and state court records filed in, or submitted to, this Court in connection with plaintiff's previous federal habeas corpus proceedings, as well as the contents of all orders and opinions issued by this Court in those same proceedings, i.e., cause nos. SA–99–CA–1301–RF and SA–07–CA–214–RF.

A. *Overview of Previous State and Federal Habeas Actions*

In July, 1995, a Bexar County jury convicted plaintiff of capital murder in connection with the May, 1994 kidnaping, aggravated sexual assault, and bludgeoning death of 16–year–old Adria Sauceda. The

Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence in an unpublished opinion. *Leal v. State,* No. 72,210 (Tex.Crim.App. February 4, 1998), *cert. denied,* 525 U.S. 1148, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999).

Sometime during calendar year 1997, petitioner notified the Mexican government of his capital murder conviction and sentence of death. Petition for a Writ of Habeas Corpus, filed March 14, 2007 in cause SA–07–CA–214–RF, docket entry no. 1, at p. 6.

In September, 1997, petitioner filed his first application for state habeas corpus relief. The state habeas trial court held several days of evidentiary hearings on petitioner's application in October and November, 1998. In an Order issued April 23, 1999, the state habeas trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's first state habeas corpus application be denied. The Texas Court of Criminal Appeals subsequently denied petitioner's first state habeas corpus application in an unpublished order, based on the state habeas trial court's findings and conclusions. *Ex parte Humberto Leal, Jr.,* App. No. WR–41,743–01 (Tex.Crim.App. October 20, 1999).

On March 13, 2000, under the name "Humberto Leal, Jr.," petitioner filed his first federal habeas corpus petition in this Court challenging his capital murder conviction and death sentence. At no time during that proceeding did petitioner request a stay so he could return to state court and seek further DNA testing in connection with his case. This Court denied petitioner's request for federal habeas corpus relief, rejecting on the merits all of petitioner's myriad assertions of ineffective assistance by his trial counsel and denying petitioner a Certificate of Appealability ("CoA"). *Leal v. Dretke,* 2004 WL

2603736, *34 (W.D.Tex. October 20, 2004). On October 13, 2005, the Fifth Circuit denied petitioner's request for a CoA. *Leal v. Dretke,* 428 F.3d 543, 553 (5th Cir.2005). The United States Supreme Court denied petitioner's petition for a writ of certiorari on April 17, 2006. *Leal v. Dretke,* 547 U.S. 1073, 126 S.Ct. 1771, 164 L.Ed.2d 522 (2006).

Petitioner filed his second state habeas corpus application, arguing therein that he was entitled to relief from his capital murder conviction and sentence of death by virtue of the determination on March 31, 2004 by the International Court of Justice at the Hague (henceforth "ICJ") in the case of *Avena and Other Mexican Nationals (Mexico v. United States of America)* that the United States of America had failed to fulfill its treaty obligations under Article 36 of the Vienna Convention with regard to petitioner and numerous other Mexican citizens then on death row in various jurisdictions throughout the United States. *See Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.A.),* No. 128, 2004 I.C.J. 12, 2004 WL 2450913 (March 31, 2004)(henceforth "*Avena*"). The Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus petition pursuant to the Texas writ-abuse statute. *Ex parte Humberto Leal,* App. No. WR–41,743–02, 2007 WL 678628 (Tex.Crim.App. March 7, 2007).

On March 14, 2007, under the name "Humberto Leal Garcia," petitioner filed his second federal habeas corpus action in this Court challenging his July, 1995 Bexar County capital murder conviction and sentence and asserting the same legal arguments premised upon the *Avena* decision he had raised in his second state habeas corpus application.[1] In a Memorandum Opinion and Order issued by Judge Royal

---

**1.** Plaintiff filed his second federal habeas cor- pus action in the Austin Division of this Court

Furgeson, this Court concluded (1) petitioner's second federal habeas corpus action was precluded by virtue of the failure of petitioner therein to first obtain permission for the filing of what was essentially a successive federal habeas corpus petition from the Fifth Circuit in accordance with Title 28 U.S.C. § 2244(b)(3) or, alternatively, (2) petitioner's *Avena* claim lacked merit because (a) petitioner had voluntarily furnished police a written statement implicating himself in Sauceda's murder *prior* to petitioner being placed in custodial detention (thus, the Vienna Convention was inapplicable to petitioner's written statements to police) and (b) the most inculpatory evidence introduced during petitioner's capital murder trial consisted was wholly unrelated to petitioner's written statements, i.e., (1) excited utterances made by petitioner's brother Gualberto suggesting petitioner had arrived home covered in blood and muttering about having killed a girl, (2) evidence showing Sauceda had fought her attacker violently and the presence of many wounds on petitioner's upper body, (3) the undisputed evidence showing petitioner was the last person seen with Sauceda when she was alive and the close proximity in time and space between petitioner's departure with Sauceda from the party and the discovery of Sauceda's battered body nearby, (4) the presence of blood inside and outside petitioner's vehicle, and (5) forensic evidence linking multiple bite marks found on Sauceda's body to petitioner's unique dental pattern. *Leal v. Quarterman*, 2007 WL 4521519 (W.D.Tex. December 17, 2007).[2] The Fifth Circuit subsequently (1) rejected this Court's conclusion petitioner's second federal habeas corpus petition was subject to dismissal pursuant to Section 2244, (2) concluded this Court erred in alternatively reaching the merits of petitioner's *Avena* claim, but (3) nonetheless denied relief on the merits based upon the Supreme Court's then-recent opinion in *Medellin v. Texas*, 552 U.S. 491, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008). *Leal Garcia v. Quarterman*, 573 F.3d 214, 224–25 (5th Cir.2009).[3]

and included therein no reference whatsoever to his prior federal habeas corpus action which had been filed and fully litigated to Judgment in the San Antonio Division of this Court as cause no. SA–99–CA–1301. After much confusion engendered by petitioner's deceptive actions, the Clerk of this Court realized the petitioner who filed that Section 2254 federal habeas corpus action was the same person who had filed SA–99–CA–1301–RF and transferred petitioner's second federal habeas corpus action to the San Antonio Division of this Court, where is was docketed as cause no. SA–07–CA–214–RF.

2. Judge Furgeson nonetheless granted CoA on a pair of issues, concluding (1) the Fifth Circuit's case law was far from crystal clear on the subject of Section 2244 dismissal in circumstances such as petitioner's and pointing out language in Supreme Court opinions suggested it was far from clear whether Section 2244 applied to petitioner's second federal habeas corpus petition therein and (2) the issue of how and when *Avena* should be applied by federal habeas courts was worthy of further consideration by the federal appellate courts.

3. Judge Furgeson's opinion for this Court in cause no. SA–99–CA–1301–RF pointed out plaintiff was most certainly aware of the existence of a Vienna Convention claim as early as the date plaintiff filed his first state habeas corpus application (i.e., May 21, 1999) because plaintiff actually included a Vienna Convention claim in his first state habeas corpus application. *Leal v. Dretke*, 2004 WL 2603736, *7 n. 92 (W.D.Tex. October 20, 2004).

Judge Furgeson concluded in plaintiff's second federal habeas corpus proceeding that, because the *Avena* decision was handed down more than six months before this Court ruled in plaintiff's first federal habeas corpus proceeding, plaintiff could have moved to amend his first federal habeas corpus petition to include an *Avena* claim (which would have been substantially similar to the same Vienna Convention claim plaintiff brought in his initial state habeas corpus application) and, there-

In 2008, plaintiff filed a motion pursuant to Chapter 64 of the Texas Code of Criminal Procedure requesting post-conviction DNA testing of a wide variety of items of physical evidence relating to his capital offense. The state trial court denied same without holding a hearing. Plaintiff appealed. The Texas Court of Criminal Appeals affirmed the trial court's denial of plaintiff's motion, concluding plaintiff had failed to demonstrate that additional testing of the materials in question would establish by a preponderance of the evidence that plaintiff would not have been convicted. *Leal v. State*, 303 S.W.3d 292, 301–02 (Tex.Crim.App.2009).

### B. *This Action*

On December 1, 2009, plaintiff filed this action pursuant to Title 42 U.S.C. § 1983, asserting rather vaguely defined Fourth, Eighth, and Fourteenth Amendment claims and seeking (1) a declaratory judgment compelling officials of Bexar County, Texas to produce plaintiff's underwear for further DNA examination, (2) an order requiring the same officials to release "biological material" requested by plaintiff, in-cluding the aforementioned underwear, and (3) attorneys fees.[4] In a Memorandum Report and Recommendation issued December 17, 2009, the Magistrate Judge concluded, under Fifth Circuit precedent, plaintiff was not entitled to declaratory or injunctive relief.[5] In an Order issued April 21, 2010, this Court adopted the Magistrate Judge's recommendation and dismissed this cause without prejudice.[6]

On May 18, 2010, following the Supreme Court's issuance of its holding in *Skinner v. Switzer, supra,* plaintiff filed a motion to alter or amend judgment[7] and, a week later, a motion requesting a stay.[8] On July 28, 2010, this Court granted plaintiff's request for a stay pending the Supreme Court's decision in *Skinner v. Switzer, supra.*[9] On March 7, 2011, the Supreme Court handed down its decision in *Skinner v. Switzer,* abrogated Fifth Circuit case law, and held a prisoner may employ Section 1983 to seek post-conviction DNA testing of crime scene evidence. *Skinner v. Switzer,* —— U.S. at ——, 131 S.Ct. at 1298.

On April 8, 2011, plaintiff filed a supplemental brief in support of his motion to alter or amend judgment.[10] On June 10,

---

fore, plaintiff had adequate opportunity to present this Court with his *Avena* claim during his first federal habeas corpus proceeding. *Leal v. Quarterman,* 2007 WL 4521519, *6 (W.D.Tex. December 17, 2007), Judge Furgeson expressly rejected plaintiff's argument that plaintiff's *Avena*/Vienna Convention claim was unripe until the date the President signed a memorandum on February 28, 2005 directing state courts to comply with the ICJ's *Avena* ruling, concluding the Presidential memorandum added nothing to plaintiff's underlying *Avena*/Vienna Convention claim. *Id.,* at *6–*7.

The Fifth Circuit's opinion in connection with plaintiff's second federal habeas corpus proceeding concluded, in pertinent part, plaintiff's *Avena*/Vienna Convention claim was not ripe until the issuance of the Presidential memorandum on February 28, 2005. *Leal Garcia v. Quarterman,* 573 F.3d 214, 223–24 (5th Cir.2009). Ironically, the Fifth

Circuit's ultimate holding in plaintiff's second federal habeas corpus proceeding, which rejecting plaintiff's *Avena* claim on the merits, relied upon the Supreme Court's holding in *Medellin v. Texas,* which concluded (as had Judge Furgeson) the Presidential memo in question had no legal effect whatsoever. *Leal Garcia v. Quarterman,* 573 F.3d at 224.

4. Complaint, filed December 1, 2009, docket entry no. 2.

5. *Docket entry no. 6.*

6. *Docket entry no. 11.*

7. *Docket entry no. 13.*

8. *Docket entry no. 14.*

9. *Docket entry no. 15.*

10. *Docket entry no. 18.*

2011, plaintiff filed a motion for a hearing.[11] On June 13, 2011, plaintiff filed an amended complaint in which he again requested declaratory and injunctive relief granting him access to his underwear and the cuttings of his underwear which the State's expert had testified at trial contained blood matching Sauceda's.[12] On June 14, 2011, plaintiff filed a motion for temporary restraining order arguing therein that, without access to the underwear and cuttings from his underwear, he will be denied "any chance to present a meaningful and complete clemency petition or successive post-conviction application based on his innocence of capital murder and will likely be executed without the opportunity to do so."[13]

### III. *The Issues*

#### A. *Section 1983 Generally*

■■■ Title 42 U.S.C. Section 1983 permits private individuals to sue state actors to enforce constitutional rights as well as right created by federal statutes. *Anderson v. Jackson,* 556 F.3d 351, 356 (5th Cir.2009); *Energy Management Corp. v. City of Shreveport,* 467 F.3d 471, 481 (5th Cir.2006); *Johnson v. Housing Authority of Jefferson Parish,* 442 F.3d 356, 359 (5th Cir.), *cert. denied,* 549 U.S. 821, 127 S.Ct. 136, 166 L.Ed.2d 36 (2006). Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of federal statutory and constitutional rights. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979); *Southwestern Bell Telephone v. City of Houston,* 529 F.3d 257, 260 (5th Cir.2008); *Hernandez v. Texas Department of Protective and Regulatory Services,* 380 F.3d 872, 879 (5th Cir. 2004).

■■ There are two essential elements to a Section 1983 action: (1) the conduct in question must be committed by a person acting under color of state law; and (2) the conduct must deprive the plaintiff of a right secured by the Constitution or the laws of the United States. *Kovacic v. Villarreal,* 628 F.3d 209, 213 (5th Cir. 2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 2995, 180 L.Ed.2d 821, 2011 WL 1374077 (June 13, 2011); *Bryant v. Military Department of Mississippi,* 597 F.3d 678, 686 (5th Cir.), *cert. denied,* —— U.S. ——, 131 S.Ct. 287, 178 L.Ed.2d 141 (2010); *Southwestern Bell Telephone v. City of Houston,* 529 F.3d at 260.

#### B. *The Gist of the Conflict Herein*

In pertinent part, Chapter 64 of the Texas Code of Criminal Procedure authorizes a motion seeking forensic DNA testing of evidence containing biological material that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense but was either (1) not previously subjected to DNA testing (under circumstances unrelated to plaintiff's claims herein) or (2) "although previously subjected to DNA testing, can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." *Leal v. State,* 303 S.W.3d at 295; Article 64.01(b), Texas Code of Criminal Procedure Annotated (Vernon Supp. 2010).

■■ Chapter 64 also requires, in pertinent part, a showing that (1) unaltered evidence is available for testing, (2) identity was an issue in the case, (3) there is a greater than 50% chance the defendant

---

**11.** *Docket entry no. 26.*

**12.** *Docket entry no. 28.*

**13.** *Docket entry no. 29.*

would not have been convicted if DNA testing provided exculpatory results, and (4) the request is not to delay the execution of the sentence. *Leal v. State,* 303 S.W.3d at 296; Article 64.03(a), Texas Code of Criminal Procedure Annotated (Vernon Supp. 2010).

The Texas Court of Criminal Appeals ruled plaintiff failed to show additional testing of the materials in question would establish by a preponderance of the evidence that plaintiff would not have been convicted. *Leal v. State,* 303 S.W.3d at 301–02.

The question before this Court in this Section 1983 action is whether the state courts' rejection of plaintiff's request for post-conviction DNA re-testing of his underwear and the cuttings therefrom deprived plaintiff of any federal constitutional right.

## IV. *Review Under Sections 1915A(b)(1) & 1915(e)(2)*

■ Title 28 U.S.C. Section 1915A requires a federal district court to review a prisoner's complaint as soon as practicable and to dismiss any claims the court finds to be frivolous, malicious, or inadequate to state a claim upon which relief may be granted. Title 28 U.S.C. Section 1915(e)(2)(B) contains a similar mandate, requiring federal courts to dismiss a case at any time if the court determines the action is frivolous or malicious or fails to state a claim on which relief may be granted. *Jones v. Bock,* 549 U.S. 199, 214, 127 S.Ct. 910, 920, 166 L.Ed.2d 798 (2007).

■ A claim may be dismissed as frivolous if it does not have an arguable basis in fact or law. *Brewster v. Dretke,* 587 F.3d 764, 767 (5th Cir.2009), *cert. denied,* — U.S. ——, 130 S.Ct. 3368, 176

L.Ed.2d 1254 (2010); *Samford v. Dretke,* 562 F.3d 674, 678 (5th Cir.2009). A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges violation of a legal interest which clearly does not exist. *Samford v. Dretke,* 562 F.3d at 678; *Geiger v. Jowers,* 404 F.3d 371, 372 (5th Cir.2005).

■ Ordinarily, a prisoner must be offered an opportunity to amend his complaint before it may be dismissed as frivolous. *Brewster v. Dretke,* 587 F.3d at 767–68. In plaintiff's case, however, he not only filed an amended complaint but has, through the filing of his voluminous motion for temporary restraining order and its accompanying exhibits, finally furnished this Court with an intelligible explanation of the factual and evidentiary bases underlying his Section 1983 claims herein. Simply put, plaintiff has now "pleaded his best case" and further opportunity to amend is unnecessary. *Brewster v. Dretke,* 587 F.3d at 768.

## V. *The Facts of Plaintiff's Capital Offense & Trial*

Plaintiff's pleadings herein contain a distorted picture of the evidence presented during petitioner's July, 1995 capital murder trial and subsequent state habeas corpus proceedings. More specifically, plaintiff repeatedly claims the *only* evidence linking him to the capital murder of Adria Sauceda consisted of blood stains found on plaintiff's underwear which were determined to be consistent with Sauceda's blood type. Plaintiff's descriptions of the evidence presented during his capital murder trial and state habeas corpus proceedings are factually inaccurate. To set the record straight, this Court will furnish a detailed recitation of the evidence elicited during those proceedings.[14]

---

14. The lurid facts and procedural history of petitioner's state criminal proceedings, culminating in petitioner's capital murder conviction and sentence of death, were set forth in

detail in Judge Royal Furgeson's opinion for this Court issued October 20, 2004 in petitioner's first federal habeas corpus proceeding

### A. *The Offense and Its Aftermath*

Late on the evening of May 20, 1994, and continuing well into the next morning, several persons attended an outdoor party held near the home of Juan Francisco "Paco" Delgado at the end of Vincent Street in San Antonio, Texas.[15] Among the party goers was sixteen-year-old Adria Sauceda.[16] At one point during the early morning hours of May 21, an apparently inebriated and only partially clad Adria was observed in the middle of a circle of males who were taking turns getting on top of her.[17] When two women approached and attempted to lend her assistance, Adria refused their offers and told them to leave her alone.[18] Adria appeared to be drunk and was unable to assist the women as they attempted to pull her pants back on her.[19]

Around the same time, another party goer, Simon Ortega, became aware that Adria was in a crowd of people in the dark behind the bushes.[20] Ortega was approached by a male, whom he did not recognize, who advised Ortega that Adria had passed out, was back behind the bushes, and had her clothes off.[21] This same individual invited Ortega to have sex with her.[22] Ortega rudely declined the invitation and, a couple hours later, observed another male carry Adria out from

and may be found at *Leal v. Dretke*, 2004 WL 2603736, *2–*7 (W.D.Tex. October 20, 2004), *CoA denied*, 428 F.3d 543 (5th Cir.2005), *cert. denied*, 547 U.S. 1073, 126 S.Ct. 1771, 164 L.Ed.2d 522 (2006).

15. At petitioner's trial, Mirasol Torres, then a teenager, testified that she and her friends attended both the party on Vincent Street and another party held several blocks away at another residence, traveling back and forth between the two locations several times during the night. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 21–23 and 26–28.

At the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner's sister Nancy Leal testified that the party in question was held near the home of Juan Francisco "Paco" Delgado, near the end of Vincent Street. Statement of Facts from Petitioner's State Habeas Corpus Proceeding (henceforth "S.F. State Habeas Proceeding"), Volume II of VII, testimony of Nancy Leal, at p. 64.

16. Mirasol Torres also testified that she recognized Adria Sauceda, whose nickname Mirasol said was "Freckles," because they had met before, shared a mutual friend, and had gone to high school together. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 24–25.

17. Mirasol Torres testified that she observed Adria with her shirt on but her pants down to her knees in the middle of a circle of guys and it was apparent to her that something was going on because she also observed soiled condoms. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 28–29.

18. Mirasol Torres testified further that she and her friend Vicki approached the scene and attempted to help Adria, who appeared "flimsy, like she was real loose, her arms and everything." S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at p. 29. Torres testified that she and Vicki attempted to pull Adria's pants back up and to get her upright but the intoxicated teenager was unable to assist them and told them to leave her alone. *Id.*, at pp. 29–30.

19. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 29–31. Torres insisted that Adria did not appear to understand what was happening to her and did not appear to be in any condition to consent to what was being done to her. *Id.*, at p. 31. Torres also testified that the guys who were sexually assaulting Adria told Torres to shut up, go get a drink, and argued that Adria knew what she was doing. *Id.*, at pp. 31–32.

20. S.F. Trial, Volume XIII of XVIII, testimony of Simon Ortega, at pp. 150–51.

21. *Id.*

22. *Id.*, at p. 151.

behind the bushes and place her on the hood of Ortega's car.[23] At that time, Adria appeared to Ortega to be "real shaken up," "disoriented," "not all there," and "like if she was in shock."[24] Ortega unsuccessfully attempted to communicate with Adria while she was lying on the hood of his car.[25]

Another male whom Ortega did not recognize then picked up Adria, carried her to a truck that was parked in the driveway of the home nearest to the party, and proceeded to "have his way with her."[26] Ortega then directed the male who sexually assaulted Adria in the truck to place her inside Ortega's vehicle so that he could take her home.[27] At that point, petitioner approached and directed that Adria be placed inside his vehicle, instead.[28] When Ortega protested, the petitioner informed Ortega that he knew the girl and her

family, knew where she lived, and would take her home and explain everything to her family.[29] Petitioner then drove away with Adria in his blue Mercedes.[30]

Shortly thereafter, petitioner's brother Gualberto and petitioner's sister Nancy arrived at the party.[31] Gualberto was obviously excited and agitated, shouting, talking fast, and gesturing in an animated manner.[32] According to Simon Ortega, petitioner's brother Gualberto jumped out his car and yelled "What the hell happened?"[33] Ortega testified that Gualberto continued yelling, informing those present that petitioner had arrived at his house "full of blood, saying he had killed a girl."[34] According to witnesses, shortly after petitioner's brother and sister departed the scene, two of the males who had remained at the party produced Adria's purse, began scattering the contents of same, and threw it up into a tree, where it became stuck in the branches.[35]

23. *Id.*, at pp. 152 and 155–56.

24. *Id.*, at pp. 156 and 158.

25. *Id.*, at pp. 161–62 and 164–65. Ortega testified that he feared for the girl's safety because a number of the young males present appeared and spoke as if there were gang related. *Id.*, at p. 161.

26. *Id.*, at pp. 165–66.

27. *Id.*, at p. 166.

28. *Id.*, at p. 166.

29. *Id.*, at pp. 167–68.

30. *Id.*, at p. 168. Ortega was not the only witness to these latter events. Juan Martinez, another party goer, observed a male hand Adria to petitioner, whom Martinez saw place her inside his Mercedes and then drive off. S.F. Trial, Volume XIII of XVIII, testimony of Juan Martinez, at pp. 105–07. Both Ortega and Martinez testified that petitioner drove off in the Mercedes with Adria and no one else. *Id.*, testimony of Juan Martinez, at p. 105; testimony of Simon Ortega, at p. 168. Ortega also testified that, when she was placed in petitioner's vehicle, Adria was wearing her blouse, shorts, and no shoes. *Id.*, testimony of Simon Ortega, at p. 169.

31. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 37–40.

32. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 38–40. Simon Ortega described Gualberto as "shocked, hysterical," "excited," and "yelling." *Id.*, testimony of Simon Ortega, at pp. 171–72; and Volume XIV of XVIII, testimony of Simon Ortega, at pp. 248–49.

33. S.F. Trial, Volume XIV of XVIII, testimony of Simon Ortega, at pp. 249–50.

34. *Id.*, testimony of Simon Ortega, at pp. 250–51. Ortega testified that petitioner's brother arrived at the party and began yelling about 25 minutes after petitioner had left the party with Adria. *Id.*, at p. 251.

35. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 43–47. Torres identified the two men who had possession of Adria's purse as Ralph Guerrero and Mickey Sanchez and identified Guerrero as one of the men who had been in the circle around Adria earlier that night. *Id.* Simon Ortega gave a substantially similar account of the disposition of Adria's purse and its contents when he testified. *Id.*, Volume XIII of XVIII, testimony of Simon Ortega, at pp. 173–74.

About the same time, several individuals began searching for Adria's body.[36] One group of young men finally found Adria lying nude on her back on a dirt road and notified the police.[37]

Photographs introduced into evidence at petitioner's trial documented the grisly scene which greeted police officers.[38] The autopsy performed on Adria's body revealed (1) she had extremely high levels of alcohol and cocaine in her blood,[39] (2) a stick with a screw in one end had been inserted into her vagina and was protruding from same,[40] (3) Adria suffered extensive bruising and numerous lacerations to her head with accompanying hemorrhage to the soft tissue of the face,[41] (4) the

36. S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at p. 56. Torres identified the four of the persons who went to look for Adria's body as Juan Martinez, brothers Ray and Mario Aguilera, and a fourth person she could not identify. *Id.*

Juan Martinez testified that he was staying with a friend several blocks from the Vincent Street party when Ray and Mario Aguilera notified him of what petitioner's brother had said and they decided to join a fourth person whom Martinez knew only as "Alex" to search for Adria's body. S.F. Trial, Volume XIII of XVIII, testimony of Juan Martinez, at pp. 109–11.

Simon Ortega testified that, immediately after petitioner's brother and sister left the scene, several persons went looking unsuccessfully for Adria's body in the bushes where she had earlier been seen with several boys. S.F. Trial, Volume XIII or XVIII, testimony of Simon Ortega, at pp. 174–75. Ortega testified that he knew Adria was not in the bushes because he had seen her drive off with petitioner. *Id.*

37. S.F. Trial, Volume XIII of XVIII, testimony of Juan Martinez, at pp. 111–13. Martinez testified that he later led police to the location of the body. *Id.*, at p. 118.

38. More specifically, State Exhibit Nos. 5, 6, 9, 10, and 11 showed Adria's nude body and battered, bloodied, face. *See* S.F. Trial, Volume XVIII of XVIII. San Antonio Police Officer Eddie Williams testified that (1) he was directed to the scene by Juan Martinez and Mario Aguilera, (2) as he approached the clearing next to Leon Creek, he observed a young female, nude, body, lying face up with a huge asphalt rock roughly twice the size of her head lying partially on her left arm, (3) her face was bloodied and there was a gaping hole from one corner of her right eye extending to the center of her head from which blood was oozing, (4) a bloody, fourteen-to-sixteen inch stick was protruding from her vagina, and (5) another four-to-five inch piece of the stick was lying to the left of her skull. S.F. Trial, Volume XIII of XVIII, testimony of Eddie Williams, at pp. 72–78.

39. Bexar County Chief Medical Examiner Dr. Vincent DiMaio testified at petitioner's trial that (1) he performed the autopsy on Adria Sauceda's body on May 21, 1994, (2) analysis of her blood revealed a blood alcohol level of .255, more than two and a half times the legal limit for driving, (3) further blood analysis reveal a cocaine level of .32 milligrams per liter of blood, significantly above the .1 level at which many people get high from that drug, (4) tests on Adria's blood also showed the presence of three metabolites of cocaine, and (5) while a trace of marijuana was detected in her urine, no significant amount was found in her blood. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 597 and 602–04. Dr. DiMaio also opined that, based on the foregoing figures, he believed Adria was high on cocaine at the time of her death. *Id.*, at p. 604. Despite the high levels of alcohol and cocaine in her blood, Dr. DiMaio opined that Adria would have been aware of what was happening to her. *Id.*, at p. 626.

40. Dr. DiMaio testified further that he determined the end of the stick containing the screw had been inserted inside Adria's vagina approximately five and one-eighth inch, causing bruising at the end of her vagina where the screw head impacted, as well as scratching and bruising the inside of the vagina. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 605–06. Dr. DiMaio also testified that, based upon the nature of Adria's injuries it appeared to him that the stick had been inserted inside her while she was still alive. *Id.*, at pp. 606–07.

41. Dr. DiMaio testified that Adria suffered (1) hemorrhage of the soft tissue of her face, cheek, and the sides of her face, (2) swelling

bridge of her nose was fractured and lacerated,[42] (5) the right side of her neck exhibited an oval bruise suggestive of a bite mark,[43] (6) her shoulders, back, and arms displayed numerous bruises and abrasions,[44] (7) an obvious bite mark with visible teeth impressions was present on the left side and back of her chest,[45] (8) the nail on Adria's left middle finger was almost completely torn off while the nail on her right middle finger was completely torn off and missing,[46] (9) Adria suffered massive hemorrhage throughout her scalp and diffuse bleeding in the cranial cavity, as well as bruising of the right front area of the brain, just under the part of the brain that rests on top the eyes, and small hemorrhages of the left side of the brain, resulting from a tremendous amount of force having been applied to her head,[47] (10) Adria had been beaten repeatedly about the face and head with a blunt object, possibly the bloody asphalt rock found near her body, although some of her injuries had definitely been caused by something other than that rock,[48] (11)

---

and abrasions on her face extending to her forehead, (3) a semi-circular bite mark to her left cheek, (4) abrasions and a laceration to her right eyebrow beginning in the middle of her right eyebrow and running downward and laterally, (5) separate lacerations to her left cheek just below her left eye, to the top of her chin, and to the under-surface of her chin, and (6) swelling and bruising to her lips. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 607–10 and 613. Dr. DiMaio testified that the bruise to Adria's left cheek, shown in State Exhibit No. 95, was too poorly defined for him to definitely conclude it was a bite but was consistent with a bite mark. Id., at p. 613. While summarizing Adria's external facial and head injuries, Dr. DiMaio made numerous references to State Exhibit Nos. 94–96, which appear in S.F. Trial, Volume XVIII of XVIII.

**42.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at p. 611.

**43.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 611–13. Dr. DiMaio testified that the oval bruise and scrapes to the right side of Adria's neck, shown in State's Exhibit No. 96, were suggestive of a bite mark. Id.

**44.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 613–15. Dr. DiMaio testified that the vertical stripes and rectangular patterns of some of this bruising suggested Adria had been struck by something linear, possibly the stick that had been inserted inside her. Id.

**45.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 615–16. Dr. Di-Maio pointed to State Exhibit No. 97 to illustrate this bite mark. Id.

**46.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 617–18. Dr. DiMaio used State Exhibit Nos. 98 and 99 to illustrate these injuries and expressed the opinion that both these injuries were defensive in nature. Id.

**47.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 620–23. Dr. DiMaio opined that (1) a lot of force had been applied to the front of Adria's face, (2) her injuries were inconsistent with her having merely fallen and struck her face or head, (3) Adria had been struck repeatedly, a minimum of three times, in the face and shoulder, and (4) her head had been shaken or struck with sufficient force to cause bruising to the white matter or interior of her brain, not just to the surface of her brain. Id. Dr. DiMaio also opined that Adria's head injuries were consistent with her having received blows to her head while she was laying down and were suggestive of someone having stood over her prone form and delivered blows. Id., at pp. 625–26. However, Dr. DiMaio also opined that some of the blood splatters he observed on Adria's lower chest and abdomen, as well as her thighs and calves, were consistent with her having bled while she was in an upright position. Id., at pp. 623–24.

**48.** S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 622, 626, and 628–29. Dr. DiMaio opined that the blows to Adria's head probably came in fairly rapid succession and that she did not die immediately after the first blow, even though the first blow may have proven fatal. Id., at pp. 630–31. While Dr. DiMaio could not say whether

bruising to the exterior of Adria's neck was consistent with manual strangulation,[49] and (12) Adria died from blunt trauma to her head.[50]

When contacted by the police later on the afternoon of May 21, 1994, petitioner voluntarily accompanied officers to the police station.[51] There, petitioner gave police two written statements. In his first statement, admitted into evidence at petitioner's trial as State Exhibit No. 48, petitioner stated that (1) he drove a girl, whom he said gave him her name as Evalin Salazar, away from the party toward her home, which she indicated was on Buda Street; (2) the girl began striking the steering wheel as he drove; (3) the girl told him to go a different direction; (4) he restrained her when she attempted to exit his vehicle while it was moving; (5) he drove her down Coconino Street and stopped at the end of that street, where she exited his vehicle; (6) he exited the vehicle and offered to take her home but she said no and ran into the bushes; and (7) after he wait-ed ten-to-fifteen minutes for her to return and she did not, he drove home.[52]

Shortly after petitioner gave police his first handwritten statement, outlined above, San Antonio Police Homicide Detective David Evans informed petitioner that petitioner's brother Gualberto had given police a written statement in which Gualberto stated that the petitioner had returned home that morning covered in blood and confessed to having killed a girl.[53] At that point, petitioner indicated that he wished to make a second statement to police.[54] In his second handwritten statement, which was admitted into evidence at his trial as State Exhibit No. 49, petitioner stated that (1) the girl was fighting with him to get out of his car; (2) after she ran into the woods, he followed her and attempted to take her back to his car; (3) she hit him and scratched him in the face so he pushed her and she fell back to the ground; (4) she did not get up and he was unsuccessful in attempting to wake her; and (5) he saw bubbles coming out her nose, got scared, and went home.[55]

Adria lost consciousness after the first blow struck her, he did acknowledge that one blow from the rock would have stunned her. *Id.*, at p. 632.

49. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at pp. 626–27.

50. S.F. Trial, Volume XV of XVIII, testimony of Vincent DiMaio, at p. 627.

51. S.F. Trial, Volume XIV of XVIII, testimony of Vincent Tristan, at pp. 280–84.

52. Petitioner admitted that he gave this first statement to police when he testified at the punishment phase of his trial. S.F. Trial, Volume XVII of XVIII, testimony of Humberto Leal, Jr., at pp. 104–10. A copy of petitioner's first statement, in his own handwriting, appears in S.F. Trial, Volume XVIII of XVIII.

53. S.F. Trial, Volume XIV of XVIII, testimony of David Evans, at p. 351. Detective Evans also testified that Gualberto Leal gave a written statement to police. *Id.*, at pp. 338–42.

54. S.F. Trial, Volume XIV of XVIII, testimony of David Evans, at p. 351.

55. S.F. Trial, Volume XIV of XVIII, testimony of David Evans, at pp. 352–55. During his testimony at the punishment phase of his trial, petitioner admitted that his first written statement was not completely accurate but insisted that his second written statement was accurate. S.F. Trial, Volume XVII of XVIII, testimony of Humberto Leal, Jr., at pp. 110–12. A copy of petitioner's second statement, also in his own handwriting, appears in S.F. Trial, Volume XVIII of XVIII. During his testimony at the punishment phase of his capital murder trial, petitioner insisted that (1) his confrontation with the girl had occurred on a sidewalk adjacent to a paved street; (2) he left the unconscious girl fully clothed at a location several blocks from the spot where her nude body was found; and (3) he did not bite the girl, did not bash her head in with a rock, and did not insert the stick into her vagina. S.F. Trial, Volume XVII of XVIII, testimony of Humberto Leal, Jr., at pp. 112–16.

While conducting a consent search of petitioner's residence the same day as the discovery of Adria Sauceda's body, two San Antonio Police Homicide Detectives discovered a beige blouse lying on the floor under a pile of laundry in the laundry room.[56] The blouse was later identified as Adria's.[57] DNA testing of blood stains on the blouse could not exclude Sauceda as a possible source of the blood thereon but did exclude plaintiff's girlfriend as a possible source of those blood stains.[58]

## B. Petitioner's Indictment

On August 17, 1994, a Bexar County grand jury indicted petitioner in case no. 94–CR–4696 on a charge of capital murder.[59]

## C. Petitioner's Trial

### 1. Guilt–Innocence Phase

The guilt-innocence phase of petitioner's trial commenced on July 5, 1995.

### a. The Prosecution's Evidence

The prosecution presented the testimony of Mirasol Torres. Simon Ortega, and Juan Martinez, outlined above, concerning the events that transpired at the party on Vincent Street that culminated in the discovery of Adria Sauceda's body.[60] A trio of law enforcement officers testified concerning the condition of Adria's body and the surrounding crime scene at the time of her discovery.[61]

In addition to hearing expert testimony concerning the results of the autopsy per-

---

**56.** S.F. Trial, Volume XIV of XVIII, testimony of David Evans, at pp. 355–61; and testimony of Andy Hernandez, at pp. 411–17.

**57.** At petitioner's trial, Simon Ortega identified the blouse (introduced as State Exhibit No. 1) as the one he had seen Adria wearing at the party the night before her murder. S.F. Trial, Volume XIV of XVIII, testimony of Simon Ortega, at pp. 199–201. Likewise, Adria's father identified State Exhibit No. 14 as a photograph showing Adria wearing the same beige blouse. S.F. Trial, Volume XIII of XVIII, testimony of Rene Sauceda, at pp. 130–35. A Texas Department of Public Safety serologist testified that the blood stains found on the brown blouse were consistent with Adria Sauceda's blood type. S.F. Trial, Volume XV of XVIII, testimony of Donna Stanley, at pp. 536–37.

**58.** S.F. Trial, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 665–66.

**59.** Transcript, at pp. 3 and 30. More specifically, the grand jury charged petitioner in paragraph A of Count I with having intentionally caused the death of Adria Sauceda by striking her with a rock and other objects unknown to the grand jury while in the course of committing and attempting to commit the kidnaping of Adria Sauceda. In paragraph B of the same Count, the grand jury charged petitioner with having intentionally caused the death of Adria Sauceda by striking her with a rock and other objects unknown to the grand jury while in the course of commit-

ting and attempting to commit the aggravated sexual assault of Adria Sauceda.

**60.** S.F. Trial, Volume XIII of XVIII, testimony of Mirasol Torres, at pp. 20–68; testimony of Juan Martinez, at pp. 99–126; testimony of Simon Ortega, at pp. 138–88; and Volume XIV of XVIII, testimony of Simon Ortega, at pp. 199–201 and 247–56.

**61.** More specifically, San Antonio Police Detective McCaskill testified that (1) he made a videotape recording of the crime scene, which was admitted into evidence as State Exhibit No. 19 and played up to the nine minute, three second mark before the jury; (2) he identified an indentation in the ground a short distance southwest from Adria's body (shown in State Exhibit No. 20) that appeared to match the shape of the large asphalt rock found lying on her left arm (shown in State Exhibit Nos. 6, 11, and 21); and (3) the indentation was wet and it appeared someone had picked up the rock from that point. S.F. Trial, Volume XIV of XVIII, testimony of Robert McCaskill, at pp. 202–18.

San Antonio Police Officer John Scott Bowers testified that (1) he took photographs of the crime scene and Adria's body shortly after the discovery of same; (2) the indentation in the ground that appeared to match the shape of the large asphalt rock found lying partially on Adria's left arm (shown in State Exhibit Nos. 6, 11, and 21) was located approximately 18 feet from the spot where it was found on Adria's left arm; (3) Adria's missing finger

formed on Adria Sauceda's body, outlined above, the jury also heard testimony from forensic serologists and DNA experts which established that (1) DNA testing performed on blood stains found on Adria's brown blouse were consistent with Adria's DNA type and inconsistent with the DNA of both petitioner and petitioner's girlfriend [62] and (2) DNA testing of stains found on petitioner's underwear determined that the stains contained a mixture of body fluids (i.e., blood, semen, and vaginal secretions) from different individuals and that at least some of the genetic material found in those mixtures could *not* have come from either petitioner or petitioner's girlfriend Elvira Briones but could have come from Adria Sauceda.[63]

San Antonio Police evidence technician Warren Titus testified that his Luminol tests for the presence of blood performed on the Blue Mercedes in which petitioner admitted he drove Adria Sauceda from the party on Vincent Street were positive (1) on the exterior of that vehicle and indicated that the exterior had been wiped in an effort to clean same, (2) on the interior passenger door panel and indicative of wipe marks in a downward direction from the door handle, and (3) on the passenger seat and consistent with a person bleeding while sitting in that seat.[64] Based on the foregoing, officer Titus opined that blood could have been wiped from each of these surfaces.[65]

A San Antonio Police Detective testified that he took photographs of petitioner's face and chest on May 21, 1994 after petitioner was arrested.[66]

A trace evidence analyst testified that both pubic and head hair samples found on the large asphalt rock found lying on Adria Sauceda's left arm were microscopically similar to Adria's hair.[67]

nail was discovered approximately five feet, six inches from the head of her body; and (4) a small rock containing blood splatters (shown in State Exhibit No. 26) was observed next to Adria's right thigh. S.F. Trial, Volume XIV of XVIII, testimony of John Scott Bowers, at pp. 256–69.

San Antonio Police Sergeant Jimmy Porter testified that (1) the large piece of asphalt he collected at the crime scene weighed between thirty and forty pounds; (2) the soil in the clearing where Adria's body was found was hard-packed dirt; and (3) State Exhibit No. 28 was the piece of asphalt he collected from the crime scene. S.F. Trial, Volume XIV of XVIII, testimony of Jimmy Porter, at pp. 270–78.

**62.** S.F. Trial, Volume XV of XVIII, testimony of Donna Stanley, at pp. 535–37; and Volume XVI of XVIII, testimony of Meghan Clement, at pp. 665–66. Meghan Clement testified that her DQ Alpha testing on two of the three blood stains from the brown blouse could have come from Adria Sauceda but definitely did *not* come from either petitioner or petitioner's girlfriend Elvira Briones. S.F. Trial, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 665–66. Ms. Clement was certain the blood stains on the blouse had not come from either petitioner or petitioner's girlfriend. *Id.*, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 667–68.

**63.** S.F. Trial, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 669–82 and 697. More specifically, Ms. Clement testified that there were genetic markers in the mixed samples taken from petitioner's underwear that could have come Adria Sauceda's blood but which could not come from either petitioner or Elvira Briones. *Id.*

**64.** S.F. Trial, Volume XIV of XVIII, testimony of Warren K. Titus, at pp. 287–303.

**65.** *Id.*, at p. 303.

**66.** S.F. Trial, Volume XIV of XVIII, testimony of Crisoforo Vieyra, at pp. 388–95. Officer Vieyra identified State Exhibit Nos. 58–62 as the photographs of petitioner which he took at the jail. Those photographs of petitioner's face, chest, and arm appear in S.F. Trial, Volume XVIII of XVIII, at pp. 38–40.

**67.** S.F. Trial, Volume XV of XVII, testimony of Tim Fallon, at pp. 583–90. More specifically, Mr. Fallon testified that (1) one pubic

A dental professor expressed opinions that (1) petitioner's teeth matched the bite marks found on Adria's body, (2) only a powerful and prolonged bite would have been sufficient to cause the bite marks on Adria's body, and (3) slippage in one of the marks suggested that either Adria had moved while she was being bitten or the person biting her had made more than one attempt to bite her in the same location.[68]

### b. *The Lone Defense Witness*

The defense called only one witness, petitioner's girlfriend Elvira Briones, who testified that she and petitioner engaged in sexual intercourse the night of the party and that she did not notice Adria Sauceda with any men at the party.[69]

### c. *The Verdict*

After deliberating approximately ninety minutes on July 10, 1995, the jury returned its verdict of guilty.[70]

### 2. *Punishment Phase of Trial*

The punishment phase of petitioner's capital murder trial began and ended the following day, July 11, 1995.

### a. *The Prosecution's Evidence*

The prosecution presented the testimony of (1) then 16-year-old Melissa Ruiz, who testified about an incident in May of 1994, about two weeks before the murder of Adria Sauceda, in which petitioner sexually assaulted and bit Ruiz on the neck[71]; (2) the San Antonio Police Officer who investigated Ruiz's report of petitioner's assault upon her and photographed the bite marks and bruises on Ruiz's body[72]; (3) the physician who examined Ruiz approximately 66 hours after the assault[73];

---

hair found on the rock had the same microscopic appearance as Adria's pubic hair, (2) three head hairs found on the rock were microscopically similar to Adria's head hair, and (3) two other hairs found on the rock were determined to have come from an animal and another human, respectively. *Id.*

68. S.F. Trial, Volume XVI of XVIII, testimony of Marden E. Alder, at pp. 722 and 724–29. In addition, Dr. Alder testified that petitioner's teeth were unique in several regard, including an obvious space between the lower right canine and lower right premolar and that the bite mark on Adria's neck was consistent with the arch shape of petitioner's teeth. *Id.*, at pp. 714–15, 719. Dr. Alder also noted that Adria's skin was broken at the sits of the bite marks on her neck and the side of her chest. *Id.*, at p. 720. The bite marks he observed on Adria's body were deep and would have required prolonged and intense force to create same. *Id.*, at p. 728.

69. S.F. Trial, Volume XVI of XVIII, testimony of Elvira Briones, at pp. 764–69.

70. S.F. Trial, Volume XVI of XVIII, at pp. 835–38; and Transcript, at pp. 136–50. The records from petitioner's state court trial indicate that the jury retired to deliberate at approximately 3:10 p.m. on July 10, 1995 and sent the trial judge a note at approximately

4:48 p.m. that same date indicating they had reached a verdict.

71. S.F. Trial, Volume XVII of XVIII, testimony of Melissa Ruiz, at pp. 62–73. More specifically, Ruiz testified that (1) she went to a party on Vincent Street where she saw petitioner, (2) petitioner took her back to his house down the street, where he undressed her and attempted to have sexual relations with her, (3) she experienced pain both while petitioner was attempted to penetrate her and while he was biting her neck but she did not say anything or scream because she was afraid petitioner would hurt her if she tried to stop him, (4) after he finished, petitioner directed Ruiz to go into the bathroom and wash herself, (5) petitioner took her back to the party and left her there, (6) she did not go right home but spent that night at a friend's house before she called her sister and told her what had happened, and (7) the bite mark remained on her neck for about a week. *Id.*

72. S.F. Trial, Volume XVII of XVIII, testimony of Angela Rux, at pp. 23–31. The bite marks on Ruiz's body are shown in State Exhibit Nos. 106 and 107 admitted into evidence at petitioner's trial and included in S.F. Trial, Volume XVIII of XVIII, at p. 110.

73. S.F. Trial, Volume XVII of XVIII, testimony of Lizette Gomez, at 31–39. Dr. Gomez

and (4) Ruiz's older sister Iza Marie, who stated that petitioner had called her repeatedly at her place of employment in the weeks following his assault on Melissa, threatening to have someone kill her if she testified against petitioner.[74] The prosecution also introduced testimony from law enforcement and school officials establishing that petitioner's reputation for being peaceful and law abiding was bad and that petitioner had a history of intimidating and bullying his fellow students and teachers.[75]

### b. *The Defense's Evidence*

The defense offered the testimony of psychiatrist Raymond Potterf, who testified on direct examination that (1) petitioner suffered from alcohol dependence and pathological intoxication, (2) the latter condition occurs when a person who ingests alcohol experiences a sudden change in mental status and becomes very aggressive, and (3) there is no cure for petitioner's condition.[76] On cross-examination, Dr.

Potterf admitted that it was possible petitioner's tendency toward violence predated petitioner's problems with alcohol.[77] On re-direct, petitioner's trial counsel elicited testimony from Dr. Potterf suggesting that petitioner had been beaten as a child and that such children tend to develop anti-social personalities.[78] On re-cross-examination, Dr. Potterf admitted that persons with anti-social personalities tend to ignore societal norms and can be dangerous.[79]

The defense also called (1) one of petitioner's former high school teachers, who testified she had counseled petitioner when he was her student, petitioner's father had mistreated petitioner and one of petitioner's brothers, and she had never felt afraid of petitioner [80]; (2) a 14–year–old friend of petitioner, who testified about an incident in which petitioner had saved his life by shoving him out of the way of gunfire [81]; (3) petitioner's 14–year–old brother Carlos, who testified that Melissa Ruiz had sent

---

observed bruising and redness to Ruiz's vaginal region, two lacerations to Ruiz's hymen, and minimal bleeding during her pelvic examination of Ruiz. *Id.*

**74.** S.F. Trial, Volume XVII of XVIII, testimony of Iza Marie Ruiz, at pp. 40–53. Iza Marie Ruiz testified that she had known petitioner from the time they were both middle school children and she believed petitioner was fully capable of making good on his threats to have her killed if she testified against him. *Id.*, at pp. 46–47 and 51. Iza Marie also testified that (1) Melissa disappeared for several days, (2) her family did not know where Melissa was, and (3) when she went to pick up Melissa, it was apparent to Iza Marie that her younger sister was crying and scared and had obviously been bitten. *Id.*, at pp. 41–43. Iza Marie also testified that, during the days after the assault on Melissa, when Melissa was missing and her family greatly concerned about her, Iza Marie spoke with petitioner, who claimed to have no knowledge where Melissa was. *Id.*, at p. 44.

**75.** More specifically, retired teacher Hoyt Garner testified about an incident in which petitioner had defied and cursed out Garner and expressed the opinion that petitioner had no respect for authority and would never change. S.F. Trial, Volume XVII of XVIII, testimony of Hoyt Garner, at pp. 4–11. San Antonio Police Officer Wayne D. Harwell, Sr. testified that petitioner's reputation for being peaceful and law-abiding was bad. *Id.*, testimony of Wayne D. Harwell, Sr., at pp. 12–17. Arnold Trevino, Assistant Principal at South San High School, testified that petitioner had intimidated both students and teachers when petitioner was a student at that school. *Id.*, testimony of Arnold Trevino, at pp. 54–59.

**76.** S.F. Trial, Volume XVII of XVIII, testimony of Dr. Raymond Potterf, at pp. 77–79.

**77.** *Id.*, at pp. 80–82.

**78.** *Id.*, at pp. 82–83.

**79.** *Id.*, at pp. 83–84.

**80.** S.F. Trial, Volume XVII of XVIII, testimony of Mary Matamaros, at pp. 85–89.

**81.** S.F. Trial, Volume XVII of XVIII, testimony of Edward Anthony Carter, at pp. 122–25.

petitioner love letters a few years before petitioner's assault on her[82]; and (4) petitioner's mother, who testified petitioner began drinking until he passed out about a year and a half ago and requested the jury to be merciful and have pity on petitioner.[83]

Petitioner testified that (1) although he did not get along with his father, his father had never beaten or hurt him[84]; (2) he was sorry the girl had died but felt her family, rather than the jury, should decide his fate[85]; (3) he had been a good inmate while awaiting trial, he had no criminal record other than this one offense, and he was not a violent person[86]; (4) he was very drunk on the date in question and, while what he did was wrong, he had not done what he was accused of having done[87]; (5) he would probably keep the peace if sent to prison but would act to defend himself if he felt threatened[88]; and (6) he had no gang affiliation.[89] On cross-examination, petitioner (1) insisted that he was innocent despite the jury's verdict of guilty[90]; (2) admitted that Adria scratched him, he pushed Adria, he felt something wet on the back of her head, he shook Adria in an unsuccessful attempt to wake her, and he fled in fear when he saw bubbles coming out of her nose[91]; (3) denied he (a) wiped blood from the Mercedes, (b) did anything more to Adria than push her down, (c) took her clothes off, (d) beat her with a rock, (e) bit her, or (f) shoved a stick inside her[92]; (4) suggested that his father found Adria's blouse in the street and brought it inside the house[93]; (5) stated that, as he was taking Adria from the party, he turned at the end of Vincent Street in the opposite direction from the way Adria directed him to go and, when Adria attempted to get out of his car, he initially refused to allow her to do so and refused to stop so she could do so[94]; (6) stated that Adria got out his vehicle and, when he attempted to take her back to his car, she began hitting, pushing, and scratching his face[95]; (7) stated that he left Adria's body fully clothed, along the side of a street, three or four streets over from the location where he nude body was found[96]; (8) denied that he bit her neck or chest[97]; and (9) admitted that any person who could bash in Adria's head, leave her with a stick inside her, and take a piece of her clothing as a trophy was a violent and dangerous person.[98] On re-direct and re-

82. S.F. Trial, Volume XVII of XVIII, testimony of Carlos Leal, at pp. 128–30.

83. S.F. Trial, Volume XVII of XVIII, testimony of Maria Francesca Leal, at pp. 131–35.

84. S.F. Trial, Volume XVII of XVIII, testimony of Humberto Leal, Jr., at p. 91.

85. *Id.*, at pp. 92–94.

86. *Id.*, at p. 94.

87. *Id.*, at p. 95.

88. *Id.*, at p. 95.

89. *Id.*, at p. 96.

90. *Id.*, at pp. 96–97 and 103. Petitioner even stated that he hoped to obtain a reversal of his conviction on appeal. *Id.*, at pp. 96–97.

91. *Id.*, at pp. 101–03.

92. *Id.*, at pp. 98, 103, 112, and 115–16. Petitioner suggested that his father used the Mercedes to go hunting and that might explain why traces of blood were found inside the vehicle. *Id.*, at p. 100.

93. *Id.*, at p. 101.

94. *Id.*, at pp. 105–08.

95. *Id.*, at pp. 108–12.

96. *Id.*, at pp. 112–14.

97. *Id.*, at p. 115. At one point during his cross-examination, petitioner laughed at the prosecutor and accused her of calling him a dog, to which the prosecutor replied "You got that right." *Id.*, at p. 114.

98. *Id.*, at pp. 116–17. More specifically, petitioner testified that he believed whomever

cross-examination, petitioner denied that he raped or bit Melissa Ruiz.[99]

### c. The Verdict

After deliberating less than two hours on July 11, 1995, the jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding that (1) there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) there was insufficient mitigating evidence to justify a life sentence rather than a sentence of death.[100]

### D. Direct Appeal

Petitioner appealed his conviction and sentence. In an unpublished opinion, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. Leal

v. State, No. 72,210 (Tex.Crim.App. February 4, 1998). The United States Supreme Court denied petitioner's petition for writ of certiorari on February 22, 1999. Leal v. Texas, 525 U.S. 1148, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999).

### E. First State Habeas Corpus Proceeding

On September 17, 1997, petitioner filed an application for state habeas corpus relief.[101] On October 19 through 21 and November 23, 1998, the state trial court held an evidentiary hearing in petitioner's state habeas corpus proceeding. On April 23, 1999, the state trial court issued an Order containing its findings of fact, conclusions of law, and recommendation that petitioner's first state habeas corpus application be denied.[102] On October 20, 1999, the Texas Court of Criminal Appeals de-

had done these things to Adria's body deserved to die. Id., at p. 116.

**99.** Id., at pp. 117–20.

**100.** S.F. Trial, Volume XVII of XVIII, at pp. 166–73; and Transcript, at pp. 159–60 and 162–63. The records from petitioner's capital murder trial indicate that the jury retired to deliberate at the punishment phase of trial at approximately 2:33 p.m. on July 11, 1995 and sent the trial judge a note indicating it had reached a verdict at approximately 4:23 p.m. that same date. Transcript, at pp. 159–63.

**101.** As grounds for state habeas corpus relief, petitioner's first state habeas application asserted (1) more than twenty instances of ineffective assistance by his trial counsel; (2) constructive denial of counsel; (3) alleged violations of the Vienna Convention arising from the admission of petitioner's two written statements; (4) the trial court erred in directing the jury to disregard the impact of parole laws on petitioner's sentence; (5) the Texas capital sentencing special issues were unconstitutionally vague; and (6) numerous claims that mirrored many of his points of error on direct appeal.

**102.** Among its findings of fact, the state habeas trial court determined that (1) petitioner gave his trial counsel several different versions of how petitioner killed Adria Sauceda, one of which corresponded to petitioner's sec-

ond written statement to the police; (2) petitioner never specifically admitted that he had intentionally killed Adria Sauceda but did admit to his trial counsel that he was alone with Adria when she died; (3) based on the information related by petitioner, his trial counsel believed there was a plausible explanation for the presence of Adria's blood on petitioner's underwear; (4) petitioner's trial counsel consulted with a dentist whose opinion regarding the bite mark evidence corresponded with that of the prosecution's expert; (5) petitioner's trial counsel did not consult with Dr. Potterf before putting him on the stand but did review Dr. Potterf's written report and called him to testify for the purpose of showing that, due to petitioner's intoxication, petitioner lacked the specific intent to kill; (6) petitioner's trial counsel was aware of the double-edged nature of Dr. Potterf's testimony regarding petitioner's anti-social personality; (7) the opinions expressed by petitioner's DNA expert during petitioner's state habeas corpus hearing were not inconsistent with the opinions expressed by the prosecution's DNA experts at trial; (8) at petitioner's state habeas corpus hearing, Dr. Alder again testified that, within a reasonable medical certainty, petitioner's teeth caused the bite mark on Adria's chest; (9) petitioner presented no evidence showing how a forensic pathologist appointed to assist the defense would have helped petitioner at trial; (10) none of petitioner's family ever told petitioner's lead trial

nied petitioner's state habeas corpus application in an unpublished written Order based on the findings made by the state trial court. *Ex parte Humberto Leal, Jr.,* App. No. 41,743–01 (Tex.Crim.App. October 20, 1999).

## VI. Standards for Interlocutory Injunctive Relief

Pursuant to Rule 65(b)(1)(A), Fed.R.Civ. P., this Court may grant a temporary restraining order without notice to the adverse party or its attorney only if the moving party furnishes specific facts in an affidavit or a verified complaint which clearly show immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition.

■■■ The four elements a plaintiff must establish to secure a preliminary injunction are: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Janvey v. Alguire,* 628 F.3d 164, 174 (5th Cir.2010); *United States v. Bill-*

*ingsley,* 615 F.3d 404, 408 n. 4 (5th Cir. 2010); *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir.2009).

■■■ When denying a motion for preliminary injunction, a district court must offer findings of fact and conclusions of law to justify the denial. *Ali v. Quarterman,* 607 F.3d 1046, 1048 (5th Cir.2010); Rule 52(a)(2), Fed.R.Civ.P.

## VII. Analyzing the Significance of Plaintiff's Stained Underwear

### A. Factual Findings

As explained above, the expert testimony at plaintiff's July, 1995 trial established only (1) the stains found on plaintiff's underwear contained a mixture of body fluids (i.e., blood, semen, and vaginal secretions) from different individuals and (2) at least some of the genetic material found in those mixtures could *not* have come from either plaintiff or his girlfriend Elvira Briones but could have come from Adria Sauceda (i.e., while plaintiff and his girlfriend could not be ruled out as possible sources of some portions of the mixed stains, at least some of the DNA found in those mixed stains could not have come from plaintiff or his girlfriend but may have come from Sauceda).[103] Thus, the expert testimony

---

counsel about seeing others at the party with blood on their clothing or about a videotape recording of the crime scene; and (11) petitioner was not in custody at the time he gave police his two written statements.

In its conclusions of law, the state habeas trial court determined that (1) the decisions by petitioner's trial counsel to call Dr. Potterf to testify and not to challenge prosecution evidence regarding blood stains on the interior of the Leal vehicle, bite marks, and DNA and blood test results were legitimate trial strategies and did not prejudice petitioner; (2) petitioner was not prejudiced by any alleged errors committed by his trial counsel during jury selection; (3) petitioner's complaints about his trial counsel's failure to call petitioner's family members to testify at trial did not satisfy the prejudice prong of *Strick-*

*land v. Washington;* (4) there was no evidence that petitioner's conduct in causing Adria Sauceda's death was merely reckless; (5) petitioner's statements were not admitted in violation of the Vienna Convention; (6) petitioner procedurally defaulted regarding his complaints about the trial court's jury instructions regarding parole eligibility and the effect of a hung jury; and (7) several of petitioner's remaining complaints were disposed of in the course of his direct appeal and not properly the subject of a state habeas corpus proceeding.

**103.** S.F. Trial, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 669–82 and 697. More specifically, Ms. Clement testified that there were genetic markers in the mixed samples taken from petitioner's underwear that could have come Adria Sauceda but

about the stains on plaintiff's underwear furnished during plaintiff's capital murder trial was hardly the "smoking gun," "most damaging evidence," or "deciding factor" plaintiff has represented same to be in his pleadings herein. Contrary to the suggestions underlying plaintiff's constitutional claims herein, plaintiff has failed to allege any specific facts showing additional DNA testing of plaintiff's underwear is likely to produce any evidence significantly probative of plaintiff's guilt or innocence.

Contrary to the suggestions contained in plaintiff's pleadings herein, absence of evidence linking plaintiff's DNA to the body of Adria Sauceda is probative of nothing. The evidence introduced during plaintiff's trial did not tend to establish plaintiff had sexually assaulted Adria Sauceda with his own penis. Rather, when viewed in the light most favorable to the jury's verdict, the evidence showed plaintiff committed aggravated sexual assault on Adria Sauceda with a piece of lumber, which was still protruding from her lifeless body when discovered, and then bashed her head in with a cement boulder.

Furthermore, when viewed in the light most favorable to the jury's verdict, even disregarding the mixed stains on plaintiff's underwear, the evidence now before this Court (including the uncontradicted testimony from plaintiff's trial counsel during plaintiff's first state habeas corpus proceeding) establishes (1) plaintiff drove a semi-conscious Adria away from a party after she had already been repeatedly sexually assaulted by other men, (2) not long thereafter, plaintiff's brother arrived at the party and exclaimed in an excited manner that plaintiff had arrived home bloody and mumbling about having killed a girl, (3) shortly thereafter, Adria's nude body was discovered with her head badly bludgeoned, (4) a piece of lumber was protruding from her vagina, (5) autopsy results showed the metal bolt on the end of the piece of lumber used to violate Adria's body had caused internal bruising establishing she was still alive when she was brutally violated with that piece of wood, (6) plaintiff admitted to his trial counsel he had fought violently with Adria and plaintiff's body bore the marks of a violent confrontation, (7) Adria's blood-stained blouse was found inside plaintiff's residence, (8) there was evidence of bloodstains on the inside and exterior of the vehicle plaintiff had used to drive Adria away from the party, (9) plaintiff admitted to his trial counsel he was alone with Adria when she "fell" and began bleeding from the nose, (10) plaintiff's teeth matched the bite marks on Adria's body, and (11) plaintiff was the last person to see Adria alive.

Quite frankly, the most salient aspect of Ms. Clements' testimony at plaintiff's trial was her assertion that the brown blouse found inside plaintiff's residence and identified by other witnesses as similar to the one worn by Adria Sauceda on the night of her murder bore blood stains for which Sauceda could not be ruled out as a possible source. Plaintiff does not suggest there was anything erroneous with that scientific finding. The presence of Sauceda's bloody blouse inside plaintiff's residence the morning after the murder was far more inculpatory than the findings Ms. Clements pronounced regarding the possible sources of the mixed DNA stains on plaintiff's underwear.

Plaintiff has alleged no specific facts showing there is any rational basis to believe there was any error or inaccuracy in the DNA tests conducted on the mixed stains found on plaintiff's underwear prior

which could not come from either petitioner or Elvira Briones. *Id.* Ms. Clement also repeatedly emphasized that the DNA testing techniques available at that time could only exclude individuals as possible sources of a mixed stain. *Id.*, at pp. 666, 668, 676, 682.

to his 1995 capital murder trial or in the interpretation of those test results given during his trial by the prosecution's DNA expert. The highly speculative assertions of Dr. Elizabeth Johnson are unconvincing for a number of reasons, chief among them her own qualifications on her opinions.[104] At one point in her declaration, Dr. Johnson challenges the actions of a Texas Department of Public Safety employee but claims to possess no personal knowledge of how that employee actually undertook her work in connection with the strips of material cut from plaintiff's underwear. In fact, Dr. Johnson does not appear to assert she has ever possessed any personal knowledge regarding the manner in which plaintiff's underwear was examined by any person prior to plaintiff's capital murder trial. At best, Dr. Johnson's complaints in her declaration amount to criticisms of the record-keeping of LabCorp and the Texas Department of Public Safety.

Plaintiff has been on constructive notice of the scope of Chapter 64 of the Texas Code of Criminal Procedure since April 5, 2001, i.e., the effective date of the original version of Article 64.01. It is not too much to ask plaintiff to furnish this Court, more than a decade later, with specific facts showing why the rather vague DNA test results on his underwear produced in 1995 about which Ms. Clement testified in such an ambiguous manner during plaintiff's capital murder trial are no longer worthy of serious consideration by a capital jury.

Plaintiff does not allege the stains in question were anything other than what they were identified to be during his trial (i.e., mixtures of DNA from multiple persons consisting of blood, semen, and vaginal secretions, some of which may have come from plaintiff and his girlfriend at the time and some of which may have come from Sauceda). This is really all the expert testimony at plaintiff's trial established vis-a-vis the underwear stains in question.

Neither Dr. Johnson nor plaintiff alleges any specific facts showing any currently available DNA testing techniques are reasonably likely to furnish test results identifying or excluding any individual as a possible contributor to the mixed DNA stains found on plaintiff's underwear.

Likewise, plaintiff has not alleged any facts suggesting precisely how further DNA testing of the stains in question (assuming such is even possible at this juncture) could produce admissible exculpatory or mitigating evidence, much less proof of plaintiff's "actual innocence." While this Court is well aware of the advances in DNA testing which have occurred since 1995, plaintiff does not explain why his expert believes any of the more advanced DNA-testing techniques currently available are likely to produce new or different results, superior to those produced in 1995.

Moreover, plaintiff fails to explain how further testing of the stains will furnish exculpatory or mitigating evidence. The prosecution's expert admitted during her trial testimony that at least some portions of the mixed stains on plaintiff's under-

---

104. Dr. Johnson states in her report and affidavit state as follows:

The photographs of test strips and gels provided to me and the labeling system used by LabCorp are of insufficient quality for me to make a thorough independent analysis and verification of the test results obtained, however, during my review of these materials I have identified several areas of concern that were not sufficiently raised at trial through cross-examination of Mr. Clement. *Declaration of Elizabeth A. Johnson*, at pp. 2–3 (¶ 6), attached to the copy of plaintiff's Motion for DNA Testing of Evidence Pursuant to Chapter 64 of the Texas Code of Criminals Appeals [sic], in turn attached as part of Appendix C to Plaintiff's Motion for Temporary Restraining Order, filed June 14, 2011, docket entry no. 29).

wear could have been furnished by plaintiff and his girlfriend.[105] Plaintiff does not apparently challenge the expert testimony suggesting plaintiff and his then-girlfriend may have contributed DNA to the mixed sample found on plaintiff's underwear. Nor does plaintiff suggest how confirmation or negation of the presence of his own DNA or that of his then-girlfriend on plaintiff's underwear would impact the outcome of his capital murder trial.

Assuming further testing of plaintiff's underwear might eliminate Sauceda as a possible contributor to the mixed stains on plaintiff's underwear (something plaintiff does not allege with any factual specificity), that fact would not impact the overwhelming weight of the inculpatory evidence presented during the guilt-innocence phase of plaintiff's capital murder trial.[106] If additional testing of the mixed stains in question were merely to confirm the presence of some DNA in the mixed stains on plaintiff's underwear for which Sauceda could not be eliminated as a potential source, there would be no change to the status quo whatsoever. The DNA evidence potentially linking Sauceda's body fluids or blood to the stains on plaintiff's underwear was not conclusive or even significant to the prosecution's charge plaintiff had murdered Sauceda while committing or attempting to commit aggravated sexual assault. The evidence at trial established plaintiff sexually assaulted Sauceda with a piece of lumber.

Significantly, during the evidentiary hearing held in plaintiff's first state habeas corpus proceeding, one of plaintiff's former trial counsel testified in pertinent part, without contradiction, that (1) plaintiff gave the defense team many different versions of the circumstances surrounding Sauceda's death, ranging from plaintiff's assertions that he was not present when Sauceda died to plaintiff's admissions he had violently fought with Sauceda and fled the scene when she fell down and blood began bubbling out of her nose,[107] (2) in all of plaintiff's versions of Sauceda's final minutes alive, plaintiff and Sauceda were the only persons present,[108] (3) plaintiff's accounts of his interactions with Sauceda confirmed most of what plaintiff had told police in his written statements,[109] and (4) the defense team did not seek independent DNA testing of the blood stains on plaintiff's clothing because plaintiff informed his defense counsel he had sat on Sauceda at one point during their struggles and it was quite possible her blood had gotten on his clothing and possibly even soaked through his jeans to his underwear.[110] Plaintiff's other co-counsel at trial testified during petitioner's first state habeas corpus proceeding that petitioner gave him an account of Sauceda's murder that was consistent with what plaintiff had told police in his written statements.[111] Plaintiff does

---

105. S.F. Trial, Volume XVI of XVIII, testimony of Meghan Clement, at pp. 669–82.

106. As explained above, the most damning evidence against plaintiff came from his own brother Gualberto, who arrived at the party and screamed out that plaintiff had arrived home bloody and muttering about having killed a girl. Plaintiff was the last person seen with Sauceda alive and insisted to others who tried to intervene that he knew her and would take her home. The morning after the murder, plaintiff's body bore signs of a violent struggle, which was consistent with the condition of Sauceda's body when discovered. Plaintiff admitted to his trial counsel he had fought violently with Sauceda and was present when she "fell" and began bleeding from the face.

107. S.F. State Habeas Hearing, Volume III of VII (proceedings October 20, 1998), testimony of Vincent D. Callahan, at pp. 73–75.

108. *Id.*, at pp. 74–75.

109. *Id.*, at p. 75.

110. *Id.*, at pp. 74, 89–90.

111. S.F. State Habeas Hearing, Volume III of VII (proceedings October 20, 1998), testimony of Jose M. Guerrero, at p. 113.

not allege any facts refuting or contradicting the sworn testimony given by his state trial counsel that plaintiff told said counsel (1) he sat on Sauceda at one point during their struggle and (2) Sauceda's blood could very well have gotten on his clothing and underwear. Based on plaintiff's statements to them, plaintiff's trial counsel made an objectively reasonable decision not to challenge the DNA evidence showing Sauceda could not be eliminated as a possible contributor to the mixed stains found on plaintiff's underwear.

Plaintiff has not alleged any specific facts showing state or local law enforcement officials acted in a manner inconsistent with plaintiff's Fourth and Fourteenth Amendment rights when they conducted DNA tests on the stains found on plaintiff's underwear or sought to introduce evidence of those tests results during plaintiff's 1995 capital murder trial. Plaintiff has not alleged any specific facts showing there was anything inappropriate, much less illegal, about the means or manner by which law enforcement officers secured plaintiff's underwear or tested same prior to plaintiff's 1995 capital murder trial. In fact, plaintiff's original and amended complaints herein are bereft of any specific facts showing precisely when and how police obtained plaintiff's underwear. Plaintiff's motion for temporary restraining order is likewise ambiguous in connection with this same complaint: "Shortly *after his arrest*, the police confiscated clothing Mr. Leal [sic] was wearing, including his undergarments. They had no warrant for his property." [112]

The identity of the contributors to the mixed stains on plaintiff's underwear was not a significant issue in the context of plaintiff's capital murder trial. There is not even a scintilla of evidence, much less a preponderance of the evidence, to suggest that, but for Ms. Clements' trial testimony identifying Sauceda as a possible contributor to the mixed DNA stains on plaintiff's underwear, the jury would have acquitted plaintiff of capital murder in connection with Sauceda's brutal murder.

### B. *Conclusions of Law*

 Further DNA-testing of plaintiff's underwear and underwear cutting, regardless of the results of such testing, will not establish plaintiff's "actual innocence" on the charge of Sauceda's capital murder. *See House v. Bell,* 547 U.S. 518, 536–37, 126 S.Ct. 2064, 2076–77, 165 L.Ed.2d 1 (2006)(holding prisoner asserting innocence as a gateway to defaulted claims must establish that, "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt"). New test results which might exclude Sauceda as a possible contributor to the mixed stains found on plaintiff's underwear would merely remove one pebble from the vast mountain of remaining circumstantial evidence establishing plaintiff's guilt. Such new test results will not impact any of the other, overwhelming, evidence of plaintiff's guilt. Such new evidence would most certainly not create any serious doubt as to plaintiff's guilt. *See House v. Bell,* 547 U.S. at 539, 126 S.Ct. at 2078 (the proper inquiry "requires a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the reasonable-doubt standard.") *(Citation omitted ).*

Plaintiff will not be deprived of any constitutionally protected liberty interest in "demonstrating his innocence through post-conviction DNA testing" by virtue of

---

**112.** Plaintiff's Memorandum of Law in Support of Motion for Temporary Restraining Order, at p. 3, attached to Plaintiff's Motion for Temporary Restraining Order, filed June 14, 2011, docket entry no. 29 (Emphasis added).

the State's refusal to render plaintiff's underwear and underwear cuttings to plaintiff's experts for further DNA analysis. *See District Attorney's Office for the Third Judicial District v. Osborne,* 557 U.S. 52, 129 S.Ct. 2308, 2320, 174 L.Ed.2d 38 (2009)("A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But '[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears.' "). New test results excluding Sauceda as a possible contributor to the mixed stains on plaintiff's underwear will not undermine the overwhelming remaining evidence establishing plaintiff's guilt or raise any legitimate doubt regarding his guilt for Sauceda's capital murder.

The State of Texas' refusal to turn over to plaintiff his underwear and underwear cuttings does not transgress any recognized principle of fundamental fairness because the exclusion of Sauceda as a possible contributor to the mixed stains on plaintiff's underwear will not exculpate plaintiff or otherwise vindicate plaintiff's substantive rights. Plaintiff's right to due process in a post-conviction proceeding is not parallel to a trial right but, rather, must be analyzed in light of the fact he has already been found guilty at a fair trial and has only a limited interest in post-conviction relief. *District Attorney's Office for the Third Judicial District v. Osborne,* —— U.S. at ——, 129 S.Ct. at 2320.

As the Texas Court of Criminal Appeals correctly noted, additional DNA testing of plaintiff's underwear and underwear cuttings will not furnish any new or additional evidence relating to the capital murder during a kidnaping charge against plaintiff. *Leal v. State,* 303 S.W.3d at 302.

The State of Texas' insistence that plaintiff present evidence, as a condition to obtaining post-conviction DNA testing, which established by a preponderance of the evidence that plaintiff would not have been convicted under the "capital murder during an aggravated sexual assault" theory if exculpatory results had been obtained does not offend notions of due process or fundamental fairness. In so requiring, Texas is merely requiring a showing analogous to that required by the United States Supreme Court to overcome a procedural default through a showing of actual innocence. *House v. Bell,* 547 U.S. at 536–37, 126 S.Ct. at 2076–77. There is nothing fundamentally unfair about requiring a criminal defendant such as plaintiff, convicted of an offense after a fair trial, to establish that any new evidence which might result from additional DNA testing raise legitimate doubts as to the defendant's guilt before such testing will be required. This is essentially what the Supreme Court already requires in order to satisfy the fundamental miscarriage of justice exception to the procedural default doctrine. *Id.*

Plaintiff has failed to allege any specific facts showing his Fourth and Fourteenth Amendment rights to freedom from unreasonable search and seizure were violated in connection with the pretrial seizure and DNA-testing of the stains on his underwear.

Plaintiff has failed to allege any specific facts showing his Fourth, Eighth, or Fourteenth Amendment rights will be violated absent DNA-re-testing of plaintiff's underwear and underwear cuttings using the most current DNA-testing techniques available.

Any new scientific evidence showing Sauceda was not a contributor to the mixed stains found on plaintiff's underwear and underwear cuttings would not be ma-

terial within the meaning of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to the outcome of either phase of plaintiff's 1995 capital murder trial. Such evidence would be neither factually exculpatory nor mitigating in light of the overwhelming evidence of plaintiff's guilt, the level of brutality inherent in the manner plaintiff murdered Sauceda, and the lurid manner in which plaintiff posed Sauceda post-mortem.

Any new scientific evidence confirming the results of the previous DNA-testing performed on plaintiff's underwear, i.e., evidence showing Sauceda was a possible contributor to the mixed stains on plaintiff's underwear, would likewise be immaterial to the outcome of either phase of plaintiff's capital murder trial.

■ Insofar as plaintiff complains about either (1) the seizure or DNA-testing of plaintiff's underwear prior to his 1995 capital murder trial, (2) the scientific validity of the prosecution's bite mark testimony introduced during plaintiff's capital murder trial, or (3) the failure of plaintiff's trial counsel to call plaintiff's parents to testify at trial regarding the circumstances surrounding the discovery of Sauceda's blouse inside the plaintiff's residence,[113] those claims are barred by the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), because such claims necessarily impinge upon the validity of plaintiff's capital murder conviction and are, therefore, not cognizable in this action for relief pursuant to Section 1983. *See Heck v. Humphrey*, 512 U.S. at 486, 114 S.Ct. at 2372 ("the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions

that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution.").

Plaintiff has failed to establish either (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, or (4) that the grant of an injunction will not disserve the public interest.

■ Plaintiff's claims herein challenging the state appellate court's refusal to grant plaintiff re-testing of the mixed DNA samples found on plaintiff's underwear all lack an arguable basis in law, i.e., they are based upon indisputably meritless legal theories, and are properly subject to dismissal as frivolous under Section 1915(e)(2)(B)(i). In so ruling, the state appellate court applied a legal principle not dissimilar to the Supreme Court's "actual innocence" standard for overcoming a procedural default. Application of this principle did not violate plaintiff's Fourteenth Amendment due process, Fourth Amendment, or Eighth Amendment rights. Moreover, plaintiff clearly failed to satisfy that standard.

## VIII. *Conclusions*

Because plaintiff's complaints lack any arguable legal basis, they are subject to summary dismissal as frivolous pursuant to Section 1915(e)(2)(B)(i). Given the uncontradicted evidence admitted during his capital murder trial and subsequent state habeas corpus proceedings, plaintiff's complaints about the state court's refusal to permit plaintiff to undertake re-testing of

---

**113.** Plaintiff asserts these arguments in support of his motion for temporary restraining order. *See* Memorandum of Law in Support of Motion for Temporary Restraining Order, at pp. 5–13, attached to Plaintiff's motion for Temporary Restraining Order, filed June 14, 2011, docket entry no. 29.

the mixed DNA samples found on plaintiff's underwear and cuttings therefrom plaintiff cannot satisfy the "actual innocence" standard set forth in *House v. Bell* and cannot satisfy Article 64.03(a)(2)(A) of the Texas Code of Criminal Procedure. Application of those legal standard does not offend plaintiff's Fourth, Eighth, or Fourteenth Amendment rights. Therefore, plaintiff has failed to demonstrate a substantial likelihood of success on the merits.

Plaintiff was convicted more than a decade and a half ago of a brutal, senseless, crime; a crime for which he has steadfastly refused to accept any responsibility despite his admissions to police and his own trial counsel that (1) he pushed Sauceda down, (2) she fell hard and did not move thereafter, and (3) he fled the scene when he observed blood flowing from her face and never made any effort to seek assistance for her. Plaintiff also admitted to his trial counsel that he fought violently with Sauceda. The lurid manner Sauceda's body was posed post-mortem reflects a level of depravity shocking even for a capital offense.

Despite the overwhelming evidence of plaintiff's guilt (even disregarding the potential presence of Sauceda's DNA on plaintiff's underwear) and the glaring absence of any truly mitigating evidence from the record in this cause, plaintiff continues to engage in dilatory tactics designed to delay his execution without providing any new, truly exculpatory, evidence. Plaintiff deliberately omitted his Vienna Convention claim from his first federal habeas corpus petition herein (after having presented same in his initial state habeas corpus application). Plaintiff then filed his second federal habeas corpus petition under a different name and in a different Division of this Court and asserted therein essentially the same Vienna Convention claim he had originally included in

his first state habeas corpus action almost a decade before. When this Court addressed the merits of plaintiff's *Avena*/Vienna Conviction claim in the context of plaintiff's second federal habeas corpus proceeding, plaintiff argued on appeal this Court erred in so doing. Despite the passage of Chapter 64 of the Texas Code of Criminal Procedure in 2001, plaintiff waited until 2008 to file a motion in the appropriate state court seeking re-testing of items containing DNA which had been admitted into evidence during his 1995 capital murder trial.

Adria Sauceda has now been dead for more years than she was allowed to live before plaintiff took her life in May, 1994. Plaintiff has fully litigated multiple state and federal habeas corpus actions challenging his 1995 capital murder conviction and death sentence. Contrary to plaintiff's repeated assertions, there has been no "rush to judgment" in his criminal case.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in plaintiff's amended complaint, filed June 13, 2011, docket entry no. 28, is **DENIED.**

2. Plaintiff's motion for Temporary Restraining Order, filed June 14, 2011, docket entry no. 29, is **DENIED.**

3. Plaintiff's motion for hearing, filed June 10, 2011, docket entry no. 26, is **DENIED.**

4. Plaintiff's motion to amend judgment, filed May 25, 2010, docket entry no. 13, is **DENIED.**

5. All other pending motions are **DISMISSED AS MOOT.**

6. This cause is **DISMISSED WITHOUT PREJUDICE pursuant to Title 28 U.S.C. Section 1915(e)(2)(B)(i).**

7. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.